[No. G013424. Fourth Dist., Div. Three. Nov. 30, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
CHRISTINE MITCHELL, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rule 976(b) and 976.1, this opinion is certified for publication with the exception of parts V through IX.

784

## COUNSEL

Fay Arfa, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Janelle B. Davis and Robert B. Shaw, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WALLIN, J.**—Christine Mitchell appeals her conviction for possessing over $100,000 obtained from drug sales and conspiracy to commit that crime, contending: (1) Health and Safety Code section 11370.6 is unconstitutional; (2) the trial court erred by failing to grant her motion to dismiss at the end of the prosecution's case; (3) section 11370.6 and CALJIC No. 12.37 unconstitutionally affect the burden of proof; (4) the trial court committed numerous instructional errors; (5) her statements to the police should have been suppressed on *Miranda*[1] grounds; (6) her trial counsel was incompetent for allowing her statements to come into evidence without proof of the corpus delicti; (7) the trial court prejudicially denied her the right to discharge her counsel after trial but before sentencing; (8) the trial court erroneously denied her motion to suppress evidence; and (9) the trial court erroneously denied her motion to disclose the identity of a confidential informant. We affirm.

On March 29, Mitchell opened 13 bank accounts at Great Western Bank in Huntington Beach, depositing $2,000 to $8,000 in each account. The funds were comprised of $92,000 in $20 bills Mitchell produced from a duffel bag she had in her car. She told bank employees she needed multiple accounts for several investors, and told the manager she was a broker for an aircraft business in Central America.

The next day the bank manager told Mitchell she must file a currency transaction report with the Internal Revenue Service, which is required when

---

[1] *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

a deposit of over $10,000 is made. After receiving this advice, Mitchell placed all the money in one account and closed the other twelve.

The same day Mitchell spoke with an aircraft broker and salesperson about buying a Rockwell Turbo Commander, an aircraft popular with drug smugglers. She had obtained a tax permit to buy aircraft without paying sales tax, although the State Board of Equalization and Federal Aviation Administration would be advised of the sale. Her husband Vincent McKinney was learning how to pilot the Rockwell Commander, purportedly to use in his steel building business before reselling it.

Five days later, Mitchell deposited $180,000 in the Newport Beach branch of Great Western, where she had been an account holder for four years. The money was carried in several shoe boxes and was comprised of $20 bills bundled in $10,000 increments. She claimed the money came from a grandmother in another state who had kept it in her house. Mitchell said she was working on a deal, and if it were successful, she would deposit more. A currency transaction report was filled out and bank employees called the police.

After the police arrived at the bank a trained narcotics dog alerted on Mitchell's cash, which had been placed in a cabinet, indicating the money or its container had been in contact with some quantity of cocaine.

Almost three weeks later, Mitchell and McKinney met with the aircraft broker and the plane's owner to examine and test fly the Rockwell Commander. The parties agreed on a $425,000 purchase price and went to the bank to wire a $25,000 deposit to the broker's bank account. After taking the broker and McKinney to the airport, Mitchell removed a laundry detergent box from a duffel bag in the trunk of the car and put the bag in the passenger compartment of the car. She drove to her bank and deposited $85,000 in $20 bills, filling out the required transaction reports. Bank staff again contacted the police, and the narcotics dog alerted on the money.

The next day Mitchell and McKinney left their motel room and drove McKinney's car to an apartment. As they left the apartment McKinney put something in the trunk, and Mitchell drove him to the airport. On the following day, the police arrested Mitchell and McKinney. In McKinney's car, they found $97,980, mostly in $20 bills, in a laundry box inside a blue overnight bag. A briefcase in the back of the car contained $7,980 in small denominations. McKinney had $3,500 on him. A search of the motel room yielded $10,000 in cash, maps of South America, Puerto Rico, and the Virgin Islands, and handbooks for an airplane. Several days later the police

found $97,310 in the apartment McKinney and Mitchell had visited before their arrest.

After her arrest, Mitchell told the police "Manny," a male Latin, provided the money to buy the airplane, which he intended to use for commercial purposes. The money purportedly came from investors and family members. She intended to sell the Rockwell Commander to Manny for $500,000, making a $75,000 profit as well as a commission. She and McKinney had gone to the apartment complex to pick up money. A male Latin placed a bag containing $8,000 at her feet and walked away. She had also been given money by other unknown male Latinos at various locations. She had deposited a total of $485,000. She assumed the money was from drug sales and the plane would be used to smuggle cocaine.[2]

At trial Honoracio Marco, an undercover officer who had infiltrated Latin American drug trafficking organizations, testified how drugs are manufactured and shipped to the United States by airplane and large vehicles. He explained how "facilitators" obtain housing, storage areas, cars, beepers, and telephones for the traffickers, and assist in purchasing assets, smuggling narcotics in airplanes, and transporting money. Facilitators pick up money, usually in $20 denominations, at gas stations, laundromats, and apartment buildings, carrying the loot in shoe boxes, workout bags, laundry bags, detergent boxes, and toy boxes. Marco believed Mitchell was a facilitator.

Mitchell testified her family had been in the aviation industry all her life. Her brother and husband were pilots, and her father was a mechanic. She had purchased aircraft in the past and obtained her license to sell and broker planes shortly before her arrest. In April 1991, Manny Freyes, the husband of a friend, offered her the opportunity to buy four large aircraft for his small commercial airline. She told Freyes she and McKinney had just purchased an airplane for use in McKinney's prefabricated building business, and McKinney flew Freyes to Mexico in exchange for Freyes's help in finding clients for McKinney.

Mitchell began to look for aircraft and decided to buy the Rockwell Commander for $425,000. She made the cash deposits for that purpose. She borrowed approximately $100,000 from an amino acid tablet manufacturer, and placed the cash in a storage locker before depositing it. She opened separate accounts for each investor, deciding with a bank employee to make

---

[2] The notes of the officer who testified about Mitchell's statements did not reflect her comments about the source of the funds or their intended use. He had testified at the preliminary hearing that Mitchell said she had no knowledge about the source of the funds and she said the plane would be used for commercial purposes.

out separate deposit slips. She was not concerned about the deposits, although she knew cash transaction forms would be required and the government would be informed. She lied to an assistant manager by saying one deposit came from her grandmother, but told several employees she was in the aircraft business.

She denied asking the assistant manager whether the "feds" were involved. She denied telling the police she knew the plane would be used for smuggling drugs or that the money came from drug proceeds. She claimed her statements to them were consistent with her trial testimony.

Vincent Guadinino testified as a defense expert about drug dealers' money laundering operations. He claimed people in the drug trade would not make a deposit of $100,000 at one time, even in separate accounts because they would know transaction reports would be prepared for the government. Another defense expert, Glen Richards, testified the Rockwell Commander was not a good plane for drug smuggling because it requires a long, smooth and clean runway. He opined aircraft are often bought for cash because a better price can be obtained.

I

Mitchell contends Health and Safety Code section 11370.6, defining the crime of which she stands convicted, is unconstitutional for several reasons. Section 11370.6 provides in relevant part: "(a) Every person who possesses any moneys or negotiable instruments in excess of one hundred thousand dollars ($100,000) which have been obtained as the result of the unlawful sale, possession for sale, transportation, manufacture, offer for sale, or offer to manufacture any controlled substance . . . with knowledge that the moneys or negotiable instruments have been so obtained, and any person who possesses any moneys or negotiable instruments in excess of one hundred thousand dollars ($100,000) which are intended by that person for the unlawful purchase of any controlled substance . . . and who commits an act in substantial furtherance of the unlawful purchase, shall be punished by imprisonment . . . . [¶] (c) In determining the guilt or innocence of a person charged under subdivision (a), the trier of fact may consider the following in addition to any other relevant evidence: [¶] (1) The lack of gainful employment by the person charged. [¶] (2) The expert opinion of a qualified controlled substances expert as to the source of the assets. [¶] (3) The existence of documents or ledgers that indicate sales of controlled substances."

Mitchell complains the statute violates her rights to equal protection and due process, and is vague and overbroad. None of these claims has merit.

■ Mitchell reasons the statute deprives her of equal protection under the law because persons possessing over $100,000 are subject to criminal prosecution, while those possessing less are totally exempted from culpability.[3] The first step in addressing an equal protection argument is to determine what standard of analysis the court will use in deciding whether the legislation passes constitutional muster: the "strict scrutiny" test, which asks whether there is a "compelling state interest" for the classification, or the "rationality" test, which inquires whether a rational basis exists for the classification. (*Alex T.* v. *Superior Court* (1977) 72 Cal.App.3d 24, 28 [140 Cal.Rptr. 17].)

■ Cases involving "suspect classifications" or "fundamental interests" merit the more stringent "strict scrutiny" test. (*People* v. *Olivas* (1976) 17 Cal.3d 236, 243 [131 Cal.Rptr. 55, 551 P.2d 375].) Although a law is presumed to be constitutional, "once it is determined that the classification scheme affects a fundamental interest or right [or involves a suspect classification] the burden shifts; thereafter *the state* must first establish that it has a *compelling* interest which justifies the law and then demonstrate that the distinctions drawn by the law are *necessary* to further that purpose." (*Id.* at p. 251.)

In *Olivas*, the Supreme Court held liberty is a fundamental interest and found no compelling state interest justified committing misdemeanants between the ages of 16 and 21 to the Youth Authority for a term potentially longer than the one-year maximum faced by older misdemeanor offenders. (17 Cal.3d at pp. 239, 251, 257.) Several later cases have recognized liberty as a fundamental interest. (See, e.g., *In re Gandolfo* (1984) 36 Cal.3d 889, 906 [206 Cal.Rptr. 149, 686 P.2d 669]; *In re Hop* (1981) 29 Cal.3d 82, 89-90 [171 Cal.Rptr. 721, 623 P.2d 282]; *Van Atta* v. *Scott* (1980) 27 Cal.3d 424, 435 [166 Cal.Rptr. 149, 613 P.2d 210]; *People* v. *Saffell* (1979) 25 Cal.3d 223, 228 [157 Cal.Rptr. 897, 599 P.2d 92].)

■ Mitchell asserts that since liberty is involved here, the strict scrutiny standard must be applied. But *Olivas* has not been read that broadly. As the court observed in *People* v. *Davis* (1979) 92 Cal.App.3d 250 [154 Cal.Rptr. 817], "[T]he *Olivas* court did not want to increase substantially the degree of judicial supervision of the Legislature's criminal justice policies. Such a highly intrusive judicial reexamination of legislative classifications is not merited by a close reading of *Olivas*. There is language in the *Olivas* opinion that emphasizes the narrowness of the holding. For instance, the

---

[3]Mitchell *appears* at times to be arguing that the specter of prosecution invokes the equal protection clause. She cites no authority for such a proposition, and we are aware of none. We treat her argument as attacking *convictions* under the law.

court noted that [Welfare and Institutions Code] section 1731.5 was constitutionally infirm because persons committed under the statute had been 'prosecuted *as adults*, adjudged by the same standards which apply to *any competent adult*, and convicted *as adults in adult courts*.' (17 Cal.3d at pp. 242-243.) This language requires only that the boundaries between the adult and juvenile criminal justice systems be rigorously maintained. We do not read *Olivas* as requiring the courts to subject all criminal classifications to strict scrutiny requiring the showing of a compelling state interest therefor." (*People* v. *Davis, supra,* 92 Cal.App.3d at p. 258.) The *Davis* court used this reasoning to conclude the Legislature needed only a rational basis to classify cocaine as a narcotic. (*Ibid.*)

Mitchell's case is similarly distinguishable from *People* v. *Olivas, supra,* 17 Cal.3d 236. It does not involve the punishment of two groups of similarly situated defendants after conviction for the same crime. Mitchell cites no case striking down a statute defining a crime because the Legislature lacked a compelling state interest in enacting it.

Some cases have assumed a compelling state interest is necessary, but have eschewed the broad application Mitchell requests. In *People* v. *Gonzalez* (1978) 81 Cal.App.3d 274 [146 Cal.Rptr. 417], the court found a compelling state interest in protecting children from molestation. But the court reasoned that "[o]nce the strict scrutiny test is met so as to justify a classification, the precise parameters drawn by the classification need only be rationally related to the interest protected." (*Id.* at pp. 277-278.) The court found a rational basis existed for harsher punishment for sodomizers who were more than 10 years older than their minor victims. (*Ibid.*)

In *People* v. *Hughes* (1980) 112 Cal.App.3d 452 [169 Cal.Rptr. 364], the court held Penal Code section 12022.6, providing for various sentence enhancements if the amounts taken in a crime exceeded certain sums, did not violate equal protection. It found that the gradation of enhancements, depending on the amount taken, created separate offenses and reasoned, " '[I]t is one thing to hold, as did *Olivas*, that persons convicted of the *same crime* cannot be treated differently. It is quite another to hold that persons convicted of *different crimes* must be treated equally. The latter are not similarly situated for equal protection purposes.' [Citation.]" (112 Cal.App.3d at p. 459.)

We agree with the *Hughes* court's distinction between punishment based on status, as in *Olivas*, and punishment that takes into account differing

degrees of harm or evil caused by violating a penal statute.[4] " 'It is the prerogative, indeed the duty, of the Legislature to recognize degrees of culpability when drafting a Penal Code. [Citation.]' " (*People* v. *Peace* (1980) 107 Cal.App.3d 996, 1004 [166 Cal.Rptr. 202] [denying probation to criminals who prey on elderly victims does not violate equal protection]; see also *People* v. *Thomas* (1974) 43 Cal.App.3d 862, 871 [118 Cal.Rptr. 226] [upholding as constitutional classifications in Pen. Code, § 487 establishing grand theft in certain circumstances].) Determining gradations of culpability includes setting the dividing line between legal and illegal conduct. It does not implicate the strict scrutiny test for equal protection purposes.

Mitchell argues strict scrutiny should be applied because it discriminates on the basis of wealth, a purported "suspect classification." (See *People* v. *Olivas, supra*, 17 Cal.3d at p. 243.) She relies on *Serrano* v. *Priest* (1971) 5 Cal.3d 584 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187], which referred to "wealth or property" as falling under that classification. (*Id.* at p. 597.) But discrimination in *Serrano* was on the basis of poverty (*ibid.*), and at least one case has held wealth in the affirmative sense does not constitute a suspect classification. (*United States* v. *Hirschberg* (7th Cir. 1993) 988 F.2d 1509, 1515; see also *San Antonio Independent School District* v. *Rodriguez* (1973) 411 U.S. 1, 20-24 [36 L.Ed.2d 16, 35-38, 93 S.Ct. 1278].)

Even if the wealthy are subject to such protection and are defined as those with more than $100,000,[5] Health and Safety Code section 11370.6 contemplates money which the possessor knows is the product of illegal transactions. Such discrimination can hardly be considered invidious or suspect.

Mitchell claims the statute discriminates on the basis of employment status because only the unemployed are singled out for scrutiny.[6] She refers to Health and Safety Code section 11370.6, subdivision (c), which allows the jury to consider a defendant's lack of gainful employment in determining guilt. That provision does not predicate culpability on unemployment status. It merely points out that it is a factor to be considered. Employed individuals can be convicted and unemployed individuals can be acquitted. If discrimination can be claimed based on such evidentiary factors, nothing would prohibit a defendant in an eyewitness identification case from claiming he or she was being discriminated against based on a resemblance to the perpetrator. (See CALJIC No. 2.92 [allowing the jury to consider the defendant's resemblance to a witness's description of the perpetrator].)

---

[4] We might not have used an analysis which speaks of an enhancement as creating different offenses.

[5] This is a debatable proposition in a world with an ever-shrinking dollar.

[6] We again treat the claim as attacking discrimination as it relates to convictions and not investigations.

Even if we applied a strict scrutiny analysis, Mitchell concedes a compelling state interest exists in stemming large-scale drug operations. (See *People* v. *Hughes, supra,* 112 Cal.App.3d at p. 459 [purpose of the Pen. Code, § 12022.6 great taking enhancement is to deter large-scale crime].) A rational way of doing so is to inhibit the laundering of cash drug proceeds by punishing those who knowingly possess large amounts of that commodity.

Mitchell complains that persons who possess[7] more than $100,000 are guilty of a felony, while those who possess even one cent less are guilty of no crime at all. Of course the Legislature could have made possession of lesser amounts a misdemeanor, but its failure to adopt that approach does not render the legislation unconstitutional. The statute is obviously aimed at large scale drug operations, so the Legislature rationally limited culpability to possessors of large amounts of cash. Although Mitchell correctly points out it is virtually impossible to show precisely what threshold would most effectively carry out the purpose of the law, such precision has never been required. (See *People* v. *Hughes, supra,* 112 Cal.App.3d at p. 459.)[8]

Mitchell urges the state cannot show how criminalizing possession of drug money without requiring any "narcotic conviction" furthers the state interest in restricting drug offenses. The analysis is simple. As the expert witness Marco testified, large-scale drug operations involve tremendous amounts of cash. To realize the fruits of the drug trade, the dealers, who are often foreign nationals, must be able to set up a sales network. To do this American facilitators procure tools of the trade such as apartments, vehicles, and pagers. Proceeds from the drug sales are used for these purposes, and the facilitators also "launder" large sums of cash, i.e., convert them to other assets which can safely be transported to the drug czars. By criminalizing the knowing possession of drug proceeds which might be used in these endeavors, facilitators can be removed from the scheme by incarceration and potential facilitators can be deterred.

Such facilitators need not be culpable for a "narcotic conviction" to be of value to the drug business. Culpability for drug possession or distribution requires possession of the narcotic substance, participation in a transaction, or at least aiding or abetting with intent to promote those offenses. (See *People* v. *Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318] [aiding and abetting requires specific intent].) Not all facilitators fit

---

[7]At numerous points in her brief, Mitchell refers to culpability attaching upon possession of drug proceeds. The statute requires possession *knowing* the source of the funds.

[8]Mitchell asks rhetorically what would prevent the Legislature from criminalizing the knowing possession of any drug proceeds. Whatever other constitutional implications such an action would have, it would certainly eliminate any possibility of the very equal protection argument Mitchell raises.

that description, but they contribute to the drug trade while knowingly possessing drug proceeds. The Legislature could properly decide to criminalize such conduct when the proceeds are in excess of $100,000. As this case demonstrates, the assistance of banking institutions is often crucial to identifying violators. By limiting culpability to large amounts, these institutions are more likely to report suspected violators. And, police resources are conserved when the class of violators is limited.

■ Mitchell asserts the statute violates due process because it is arbitrary and capricious because the conduct prohibited is so far removed from drug trafficking as to have no effect on it. "Generally, the constitutional guaranty of substantive due process protects against arbitrary legislative action; it requires legislation not to be 'unreasonable, arbitrary or capricious' but to have 'a real and substantial relation to the object sought to be attained.' [Citation.] Thus, legislation does not violate substantive due process so long as it reasonably relates 'to a proper legislative goal.' [Citations.]" (*Coleman* v. *Department of Personnel Administration* (1991) 52 Cal.3d 1102, 1125 [278 Cal.Rptr. 346, 805 P.2d 300].)

Mitchell concedes the state has an interest in restricting drug trafficking and we have explained how Health and Safety Code section 11370.6 furthers that interest. Although it does not necessarily deal with the actual drug sellers or possessors, it has a rational relationship to deterring them. Many statutes prohibit conduct directed tangentially at another evil. (See, e.g., Pen. Code, § 466 [prohibiting possession of burglary tools]; Health & Saf. Code, § 11364 [prohibiting possession of paraphernalia for ingesting drugs].) Penal Code section 186.10, which prohibits criminal transactions of more than $5,000, is very similar to Health and Safety Code section 11370.6. Although it is conceivable some statute might proscribe conduct so far detached from the evil it seeks to control that it violates due process mandates, this is not such a statute.

Mitchell asserts that nothing about possession of more than $100,000 of drug proceeds does anything more to further the drug trade than possession of a lesser amount. As we have discussed, that is not the test. Once it is established that the general prohibition furthers the legislative goal, the Legislature has wide discretion in determining what limits will be set on the prohibition. (*People* v. *Hughes, supra,* 112 Cal.App.3d at p. 459.) As long as the statute rationally serves its purpose, it is not made arbitrary or capricious because it might have been drawn more narrowly or widely.

Mitchell contends the statute is vague and overbroad. In *People* v. *Superior Court (Caswell)* (1988) 46 Cal.3d 381 [250 Cal.Rptr. 515, 758 P.2d 1046], the Supreme Court explained the legal principles relevant to a claim

of vagueness: "That no person shall be deprived of life, liberty or property without due process of law is, of course, a cornerstone of our jurisprudence. [Citation.] 'The requirement of a reasonable degree of certainty in legislation, especially in the criminal law, is a well established element of the guarantee of due process of law.' [Citation.] ▉ To withstand a facial vagueness challenge under the due process clause, a statute must satisfy two basic requirements.

"First, a statute must be sufficiently definite to provide adequate notice of the conduct proscribed. '[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law. [Citations.]' [Citations.] ' "[B]ecause we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning." ' [Citations.]

"Second, a statute must provide sufficiently definite guidelines for the police in order to prevent arbitrary and discriminatory enforcement. 'A vague law impermissibly delegates basic policy matters to policemen, judges and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.' [Citation.] 'Where the legislature fails to provide such minimal guidelines, a criminal statute may permit "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections." ' [Citations.]" (46 Cal.3d at pp. 389-390.)

Nonetheless, " '[R]easonable certainty is all that is required. A statute will not be held void for vagueness if any reasonable and practical construction can be given its language or if its terms may be made reasonably certain by reference to other definable sources.' [Citation.] It is settled that the fact that a term is somewhat imprecise does not itself offend the requirements of due process. ' ". . . [T]he Constitution does not require impossible standards; all that is required is that the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices . . . ." [Citation.]' [Citation.] 'The law is replete with instances in which a person must, at his peril, govern his conduct by such nonmathematical standards as "reasonable," "prudent," "necessary and proper," "substantial," and the like. Indeed a wide spectrum of human activities is regulated by such terms. . . . Yet standards of this kind are not impermissibly vague, provided their meaning can be objectively ascertained by reference to common experiences of mankind.' [Citation.]" (*People* v. *Green* (1991) 227 Cal.App.3d 692, 698-699 [278 Cal.Rptr. 140].)

"[T]o succeed on a facial vagueness challenge to a legislative measure that does not threaten constitutionally protected conduct . . . a party must do more than identify some instances in which the application of the statute may be uncertain or ambiguous; [s]he must demonstrate that 'the law is impermissibly vague *in all of its applications.*' " (*Evangelatos* v. *Superior Court* (1988) 44 Cal.3d 1188, 1201 [246 Cal.Rptr. 629, 753 P.2d 585].)

Mitchell contends the statute's claimed vagueness infringes on a "fundamental right" she describes as the "opportunity to possess money." The statute allegedly impinges on "the achievement of economic security, which is essential for the [pursuit of] life, liberty and happiness." She cites no authority for this proposition. Although the general proposition may be attractive, it certainly cannot extend to money that is the product of unlawful drug transactions. Such money is effectively contraband, and is subject to forfeiture. (See Health & Saf. Code, § 11470, subd. (f).) Health and Safety Code section 11370.6 clearly draws the line between that type of money and lawful money.

Contrary to Mitchell's insinuation, the section requires more than mere possession of such money. The accused must possess it with knowledge of its source. The presence of a scienter element goes a long way toward avoiding vagueness problems. (*Village of Hoffman Estates* v. *Flipside, Hoffman Estates* (1982) 455 U.S. 489, 499 [71 L.Ed.2d 362, 372, 102 S.Ct. 1186]; *People* v. *Superior Court (Caswell)*, *supra*, 46 Cal.3d at p. 391; *People* v. *Martin* (1989) 211 Cal.App.3d 699, 706 [259 Cal.Rptr. 770, 86 A.L.R.4th 383] [knowledge held to be sufficient scienter]; *People* v. *Nelson* (1985) 171 Cal.App.3d Supp. 1, 9-10 [218 Cal.Rptr. 279] [applied to sales of potentially innocent items to be used as drug paraphernalia].)

*United States* v. *Antzoulatos* (7th Cir. 1992) 962 F.2d 720, on which Mitchell relies, is virtually on all fours. Antzoulatos, a car dealer, was convicted of violating 18 United States Code section 1956(a)(1)(B), prohibiting the possession of proceeds from certain unlawful activities with the knowledge of their character where the transaction was designed to conceal the proceeds or avoid reporting requirements. (962 F.2d at pp. 723-724.) The Court of Appeals rejected his argument that the statute violated his liberty interest in selling lawfully acquired cars, and rejected his void-for-vagueness argument. The court pointed out that regulation of economic activity does not implicate the First Amendment, and therefore must be evaluated on the facts of the case. The existence of a scienter requirement did much to dispel any concerns about vagueness. (*Id.* at pp. 725-726; see also *United States* v. *Jackson* (7th Cir. 1991) 935 F.2d 832, 838-839 [121 A.L.R.Fed. 777].)

The court acknowledged there might be problems where the accused's knowledge was gained from a potentially incredible source, or from the

appearance of the buyer, or from the presence of unexplained wealth. But the court concluded such hypothetical problems could be adequately addressed by examining the sufficiency of the evidence, and that they did not render the statute impermissibly vague. (*United States* v. *Antzoulatos, supra,* 962 F.2d at p. 727.) This reasoning disposes of Mitchell's claim that the average citizen cannot be expected to "know" when money is the product of drug transactions. Although some circumstances might raise questions of the sufficiency of the evidence, the expert evidence produced here, Mitchell's admissions and her surreptitious conduct were sufficient to show knowledge. "[Offenders] cannot complain of the vagueness of a statute if the conduct with which they are charged falls clearly within its bounds." (*Bowland* v. *Municipal Court* (1976) 18 Cal.3d 479, 492 [134 Cal.Rptr. 630, 556 P.2d 1081].)[9]

Mitchell asserts the term "as a result of," used in conjunction with the illegal drug behavior set forth in the statute, is not reasonably comprehensible. Not so. Although the word "result" is not defined, it has a common meaning: "as a consequence." (Webster's New Internat. Dict. (3d ed. 1981) p. 1937.) The average person would have no problem understanding that definition. Even if we were to accept Mitchell's unsupported claim that virtually any money could have come from a drug transaction at some unspecified time in the past, the knowledge requirement in the statute prohibits the conviction of some unsuspecting possessor. It obviates any concern Mitchell has that the police might prosecute anyone possessing over $100,000 in cash.[10]

Mitchell argues it is impossible for the average person to determine "what money is 'obtained' [as a result of illicit drug activities] because there is no requirement the prosecution prove any actual connection with drugs." She errs in her premise. The statute specifically requires the money to have been obtained from such unlawful activities. To the extent she has a complaint, we will address it in conjunction with her contention the evidence was insufficient.

Mitchell asserts the term "negotiable instrument" is vague, but gives the clear definition contained in Black's Law Dictionary: "a written and signed

---

[9]This answers Mitchell's hypothetical questions about whether the statute applies where the money is transferred through an innocent third party, and how one can obtain money as the result of the crime of possessing drugs for sale. Nothing shows her situation involved these circumstances. Similarly, Mitchell's complaint that the statute could involve merchants who innocently deal with drug dealers and children of such dealers who receive monetary gifts does not invoke the circumstances of her case. Likewise, that portion of the statute which prohibits possessing money for the purpose of purchasing drugs does not deal with her conduct, and she may not attack it.

[10]Mitchell again analyzes the problem from the perspective of police *investigations*. Although Fourth Amendment constraints exist, nothing about the vagueness doctrine limits investigations.

unconditional promise or order to pay a specified sum of money on demand or at a definite time payable to order." (Black's Law Dict. (6th ed. 1990) p. 1035.) In any event, she may not complain on that ground because only cash was involved here. (*Bowland* v. *Municipal Court, supra,* 18 Cal.3d at p. 492.)

■ Mitchell's attack on grounds of overbreadth must fail as well. "[A] facial overbreadth challenge is difficult to sustain. The [United States Supreme Court] has emphasized that '[a]pplication of the overbreadth doctrine . . . is, manifestly, strong medicine. It has been employed . . . sparingly and only as a last resort.' [Citation.]" (*Williams* v. *Garcetti* (1993) 5 Cal.4th 561, 577 [20 Cal.Rptr.2d 341, 853 P.2d 507].) " '[A] governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms.' [Citation.] However, to successfully challenge a statute as overbroad, the overbreadth must not only be real, but must be substantial as well, judged by the legitimate reach of the law." (*In re Alberto R.* (1991) 235 Cal.App.3d 1309, 1316 [1 Cal.Rptr.2d 348].) "[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." (*City Council* v. *Taxpayers for Vincent* (1984) 466 U.S. 789, 800 [80 L.Ed.2d 772, 783, 104 S.Ct. 2118].)

"[T]he overbreadth doctrine does not apply to commercial speech." (*Hoffman Estates* v. *Flipside, Hoffman Estates, supra,* 455 U.S. at p. 497 [71 L.Ed.2d at pp. 370-371].) The present case involves at most concerns about commercial speech (*United States* v. *Antzoulatos, supra,* 962 F.2d at p. 726), so Mitchell may not raise the claim. Even if she could, our analysis on the vagueness question shows the statute's scope fairly encompasses the precise evil it seeks to prevent without infringing on legitimate commercial activities.

## II

■ Mitchell contends the trial court erred by failing to grant her motion to dismiss under Penal Code section 1118.1.[11] In reviewing that contention, we use the same standard applied in reviewing the evidence on appeal. When the sufficiency of the evidence is challenged, the court is not required to " ' "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." [Citation.] Instead the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.]" (*People* v. *Johnson*

---

[11]The section allows the defense to move for an acquittal at the end of the prosecution's case on the ground the evidence is insufficient to support a conviction.

(1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)

■ Mitchell claims the prosecution proof fell short in two respects. It failed to show the money was from unlawful drug activities and that Mitchell knew it.[12] She cites federal cases for the proposition the prosecution must present evidence the defendant received the money directly from a drug dealer (*United States* v. *Gallo* (5th Cir. 1991) 927 F.2d 815, 822), or was involved with persons directly engaged in drug trafficking activities (*United States* v. *Antzoulatos, supra,* 962 F.2d at p. 727), or actually sold drugs (*United States* v. *Jackson, supra,* 935 F.2d at p. 836). None of those cases stand for the proposition such facts are a sine qua non of sufficient evidence. The appellate courts merely found sufficient evidence based on those facts.[13]

Here, the trained narcotics dog alerted to the money Mitchell deposited.[14] The money was seen in packages used by collectors of drug proceeds, and Mitchell was untruthful about its source. She finally told the arresting officer she "assumed" it was from narcotics trafficking. The expert witness testified, albeit somewhat implicitly, that the money was from drug transactions. The money was to be used to buy an airplane that was suitable for transporting narcotics. This evidence was ample to prove beyond a reasonable doubt the money was from the requisite source.

The same evidence proved Mitchell knew it. In this regard, she makes two inaccurate factual claims. She says there was no active concealment, apparently because she put the money in banks instead of hiding it beneath the bed. But by her own admission, she lied about the source, saying it came from her grandmother's estate. She also claims she made no attempt to avoid the reporting requirements. However, she opened 13 accounts to ensure deposits of less than the $10,000 reporting requirements, only placing the money in 1 account after learning the deposits would be reported anyway.

---

[12]Mitchell also argues there was no evidence she intended to use the money to purchase drugs. This is true, but it is irrelevant to her case because, contrary to her contention, the statute does not require proof both that she knew the money was from unlawful drug activities *and* that she intended to use it to buy drugs. Health and Safety Code section 11370.6 provides: "Every person who possesses any moneys [with knowledge of an unlawful drug source], and *any person* who possesses *any* moneys [with the intent to buy drugs] [is guilty of a felony]." (Italics added.) This language plainly sets forth two classes of persons who may be held culpable under the statute, not one class which must satisfy two requirements regarding intent. If the Legislature had intended the former, it would have used language such as "and who intends to [buy drugs] with *such* moneys," omitting the reference to "any person." Legislative history is in accord with this interpretation. (Assem. Com. of Pub. Saf. Rep. (May 11, 1987); Analysis of Assem. Bill No. 2502 (1987-1988 Reg. Sess.) as amended Jan. 15, 1988.)

[13]In any event, none of these cases interpreted Health and Safety Code section 11370.6.

[14]Although this was some evidence of guilt, we do not suggest that it would ever be sufficient, standing alone, to support a conviction or other standard of proof.

Mitchell cites no case with facts vaguely similar to those here that found the evidence of knowledge to be insufficient. The evidence allowed a reasonable juror to conclude beyond a reasonable doubt not only that Mitchell knew the source of the funds but that she took affirmative steps to conceal it.[15]

### III

■ Mitchell urges Health and Safety Code section 11370.6 and CALJIC No. 12.37 unconstitutionally affect the burden of proof, by negating the requirement of proof beyond a reasonable doubt and by requiring the defendant to prove gainful employment. Not so.

CALJIC No. 12.37, as read to the jury, provides: "In determining whether a defendant is guilty or not guilty of the crime of violating Health and Safety Code section 11370.6(a), you *may* consider all of the evidence relevant thereto, *including but not limited to*: [¶] The gainful employment or lack thereof of the defendant[;] [¶] Expert opinion of a qualified controlled substances expert as to the source of the assets; [and] [¶] [T]he nature of defendant's banking transactions." (Italics added.) The instruction parrots subdivision (c) of Health and Safety Code section 11370.6.

Mitchell relies on *Sandstrom* v. *Montana* (1979) 442 U.S. 510, 520 [61 L.Ed.2d 39, 48-49, 99 S.Ct. 2450] and *Carella* v. *California* (1989) 491 U.S. 263, 265 [105 L.Ed.2d 218, 221-222, 109 S.Ct. 2419], which held that *mandatory* presumptions that remove an element of proof from the prosecution's case unconstitutionally lighten the prosecution's burden to prove each element beyond a reasonable doubt. In *People* v. *Roder* (1983) 33 Cal.3d 491 [189 Cal.Rptr. 501, 658 P.2d 1302] the California Supreme Court held an instruction created an invalid mandatory presumption because the trial court told the jury it "should" draw certain inferences if it found specified facts to be true. (*Id.* at pp. 503-504.) But the Supreme Court noted the instruction could be amended to state a constitutionally *permissive* presumption by telling the jury that it "is permitted—but is not required to" draw such inferences. (*Id.* at p. 506; see also *People* v. *Milham* (1984) 159 Cal.App.3d 487, 503-505 [205 Cal.Rptr. 688].)

In *People* v. *Anderson* (1989) 210 Cal.App.3d 414 [258 Cal.Rptr. 482] the Court of Appeal used the distinction between permissive and mandatory

---

[15]The cases she relies on do not dictate a contrary result. (See *United States* v. *Awan* (11th Cir. 1992) 966 F.2d 1415; *United States* v. *Isabel* (1st Cir. 1991) 945 F.2d 1193, 1202; *United States* v. *Sanders* (10th Cir. 1991) 928 F.2d 940, 944; *United States* v. *Blackman* (8th Cir. 1990) 904 F.2d 1250, 1256; *United States* v. *Massac* (3d Cir. 1989) 867 F.2d 174, 177-178.) Like the cases she cites on the issue of the money's source, all of these cases, except *Blackman*, involve facts which can provide an adequate factual basis for the inference of knowledge, but do not purport to set forth a minimum factual standard. The *Blackman* court opined that the government may not rely solely on proof the defendant got the money from someone with no legitimate source of income (*United States* v. *Blackman, supra,* 904 F.2d at p. 1257), but the facts here go well beyond that point.

presumptions to find CALJIC No. 2.15 did not impermissibly lighten the prosecution's burden. (210 Cal.App.3d at pp. 427-429; accord, *People* v. *Johnson* (1993) 6 Cal.4th 1, 37-38 [23 Cal.Rptr.2d 593, 859 P.2d 673].) That instruction iterates factors from which a juror might find that a defendant who possessed stolen property is guilty of knowingly possessing it or having stolen it. (CALJIC No. 2.15 (5th ed. 1994 pocket pt.) p. 12.) It is similar to CALJIC No. 12.37 in that it directs the jury to evidence it "may consider" in determining guilt.[16]

All CALJIC No. 12.37 does is direct the jury's attention to potentially relevant evidence. It does not limit the jury's inquiry to such evidence, does not require the jury to attach any particular weight to it, and does not limit the possible inferences to those pointing toward guilt. It is in the nature of a *"Sears"* instruction, which directs the jury to evidence from which a reasonable doubt might be drawn. (*People* v. *Sears* (1970) 2 Cal.3d 180, 190 [84 Cal.Rptr. 711, 465 P.2d 847]; see also *People* v. *Wright* (1988) 45 Cal.3d 1126, 1140 [248 Cal.Rptr. 600, 755 P.2d 1049].) The difference is that CALJIC No. 12.37 does not direct the jury to inferences pointing toward guilt or innocence, but allows the jury to decide which inference, if any, is appropriate.

In a related argument, Mitchell asserts the instruction "presumes and directs the jury to find that the controlled substances expert . . . possesses the requisite 'expert opinion' as to the source of the funds." It does not. The instruction says the jury *"may* consider [ ] [e]xpert opinion of *a* qualified controlled substance expert as to the source of the assets . . . ." (CALJIC No. 12.37.) Nothing in the instruction tells the jury any purported expert who testified was qualified or that it must accept the purported expert's opinion. The jury was also instructed under CALJIC No. 2.80, which provides the guidelines for determining whether an expert is qualified, tells the jury it may consider such qualifications, and allows the jury to disregard any purported expert testimony.[17]

To make this argument, Mitchell urges Marco's expertise concerning controlled substances did not necessarily make him an expert in the area of

---

[16]The first paragraph of the instruction tells the jury that mere possession of stolen property is insufficient to prove guilt and that corroboration must exist. The second paragraph lists a variety of factors the jury "may consider." (CALJIC No. 2.15 (5th ed. 1994 pocket pt.) p. 12.)

[17]CALJIC No. 2.80, as read to the jury, provides: "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert *on the subject to which his testimony relates.* [¶] A duly qualified expert may give an opinion as to questions in controversy at a trial. To assist you in deciding such a question, you may consider the opinion or the reasons given for it, if any, by the expert who gives the opinion. You may also consider the qualifications and credibility of the expert. [¶] You are not bound to accept an expert opinion as conclusive, but should give to it the weight to be [*sic*] which you find it to be entitled. You may disregard any such opinion if you find it to be unreasonable." (Italics added.)

financial transactions. Contrary to this assertion, Marco's testimony established he was intimately familiar with the intricacies of finances in the drug trade, particularly as it related to laundering drug funds. The jury was directed to consider his qualifications on the subject to which his testimony related. The area of inquiry was, to use the vernacular, "right up his alley."[18]

 Mitchell claims CALJIC No. 12.37 shifts the burden of proving gainful employment to the defendant. Again, she confuses the elements of the crime and presumptions with the evidence and general inferences to be drawn from it. The prosecution has no burden to prove lack of gainful employment, nor does the defense have any greater burden to rebut it than it does any potentially damning evidence. It is merely a factor for the jury to consider in deciding whether the elements have been proved. Here, although Mitchell presented evidence to show she was legitimately in the airplane brokering business, she had no burden to do so.

## IV

Mitchell urges the trial court committed numerous instructional errors: (1) the court did not define several terms used in CALJIC No. 12.37; (2) the court failed to tell the jury no documents or ledgers regarding drug sales existed; (3) the court should have instructed sua sponte on the weight to be given dog tracking evidence; (4) the trial court erroneously told the jury it could consider the nature of Mitchell's banking transactions; (5) CALJIC No. 12.37 renders CALJIC No. 2.80 prejudicially redundant and creates a preferential standard for the qualified controlled substances expert; (6) by inflating the credibility of the qualified controlled substances expert, CALJIC No. 12.37 invades the province of the jury; (7) the trial court should have instructed on the sufficiency of circumstantial evidence to prove specific intent; and (8) cumulative instructional error requires a reversal. None of the claims has merit.

 Mitchell contends the trial court should have defined sua sponte the terms "qualified controlled substances expert," "assets," and "gainful employment." "When . . . a phrase 'is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request.' [Citation.]" (*People* v. *Rowland* (1992) 4 Cal.4th 238, 270-271 [14 Cal.Rptr.2d 377, 841 P.2d 897].)

---

[18]To the extent Mitchell's comments on Marco's expertise are a challenge to his expertise and not an attack on the instructions, she does not point to an objection in the record. (See Evid. Code, § 353; *People* v. *Szeto* (1981) 29 Cal.3d 20, 32 [171 Cal.Rptr. 652, 623 P.2d 213].)

The terms "assets" and "gainful employment" are common terms and nothing about Health and Safety Code section 11370.6 implies a peculiar meaning was intended. Certainly nothing about these terms is any more complex than others found not to require amplification. (See *People* v. *Rowland, supra*, 4 Cal.4th at pp. 270-271 ["while engaged in"]; *People* v. *Hardy* (1992) 2 Cal.4th 86, 153 [5 Cal.Rptr.2d 796, 825 P.2d 781] ["fraud" and "specific intent to defraud"]; *People* v. *Howard* (1988) 44 Cal.3d 375, 408 [243 Cal.Rptr. 842, 749 P.2d 279] ["financial gain"]; *People* v. *Cantrell* (1992) 7 Cal.App.4th 523, 543-544 [9 Cal.Rptr.2d 188] ["rectal area"].) If, as Mitchell asserts, there was any danger the jury might think "assets" referred to the airplane, or "gainfully employed" did not include self-employment, she could have requested an amplifying instruction. To the extent "qualified controlled substances expert" was a technical term, it was adequately amplified by CALJIC No. 2.80.[19]

Mitchell claims the court should have told the jury there were no documents or ledgers relating to drug sales because their existence is a factor listed in CALJIC No. 12.37 and Health and Safety Code section 11370.6 for the jury's consideration. The court modified that portion of the standard instruction to refer only to "the nature of [Mitchell's] banking transaction." Mitchell incorrectly reasons the factor was a principle closely and openly connected with the facts before the court and necessary for the jury's understanding of the case, which required a sua sponte instruction. The factor merely focuses the jury's attention on a relevant consideration in ascertaining guilt. Instructions on such factors are not required sua sponte. (*People* v. *Saille* (1991) 54 Cal.3d 1103, 1119 [2 Cal.Rptr.2d 364, 820 P.2d 588].)

Mitchell argues the court should have instructed sua sponte on the weight to be given to dog tracking evidence, relying on *People* v. *Gonzales* (1990) 218 Cal.App.3d 403 [267 Cal.Rptr. 138] and *People* v. *Malgren* (1983) 139 Cal.App.3d 234 [188 Cal.Rptr. 569]. Unlike those cases, Mitchell's case did not involve dog *tracking*, it involved the identification of cocaine on money. The *Malgren* court relied heavily on the crucial importance of the defendant's identity in a case in deciding an instruction on dog tracking must be given sua sponte. (139 Cal.App.3d at pp. 241-242.) Here, the evidence only suggested the money had been in some contact with some amount of cocaine at some time. Under these circumstances, a sua sponte instruction is not necessary.

---

[19]Mitchell argues that without further explication of the term, the jury might have thought Officer Voth's testimony about the dog's detection of cocaine on Mitchell's money was testimony from a "qualified controlled substances expert." Voth was such an expert. Mitchell does not challenge his qualifications in the area of his testimony and as it related to the source of the funds. It qualified under the definition.

Even if it were, it is not reasonably likely the failure to give the instruction affected the verdict. (*People* v. *Malgren, supra,* 139 Cal.App.3d at p. 242.) Marco gave his expert opinion of the source of the funds based on factors other than the dog's alerting on the money. And Mitchell's statements about the source of the funds and her surreptitious behavior were of much greater magnitude than the dog's "identification."

Mitchell asserts the trial court erroneously told the jury it could consider the "nature of [Mitchell's] banking transactions" as a factor in assessing her guilt or innocence. It was a modification of an instruction she had submitted on the topic.[20] She reasons the term "nature of defendant's banking transactions" was vague and ambiguous, and the instruction failed to tell the jury her actions were inconsistent with the requisite element of knowledge.

A defendant has a right to an instruction which directs the jury to evidence from which it might find a reasonable doubt about the defendant's guilt. (*People* v. *Sears, supra,* 2 Cal.3d at p. 190.) The instruction the court gave was sufficiently clear to direct the jury's attention to evidence of Mitchell's banking transactions, which she claimed showed her lack of knowledge the funds were from illegal activities.

The instruction she requested suffered from two major defects. First, it assumed she knew the bank would file reports alerting government and law enforcement agencies, something the jury had to determine. Second, as worded, the instruction constituted a favorable comment by the court on the defense evidence. It implied Mitchell was eager to comply with federal banking regulations and that her attitude showed her innocence. Such instructions are improper. (*People* v. *Johnson* (1992) 3 Cal.4th 1183, 1232 [14 Cal.Rptr.2d 702, 842 P.2d 1] [instruction may not invite jury to draw inferences favorable to the defendant from specified items of evidence]; see generally, *People* v. *Slocum* (1975) 52 Cal.App.3d 867, 893 [125 Cal.Rptr. 442].)

---

[20]Her proposed instruction read: "The defendant asserts that she did not possess $100,000 with knowledge that the money was the result of an unlawful controlled substance transaction as specified in Section 11370 of the Health & Safety Code. [¶] You may consider the defendant's taking of the money openly to the bank where she was aware that the bank would file currency transaction reports and thereby alert the appropriate government and law enforcement agencies to its deposit in determining whether she had knowledge that the money was the result of a prohibited controlled substance transaction. [¶] The defendant's mere suspicion or belief that the money was derived from drug trafficking is not sufficient to constitute a violation of Section 11370.6 of the Health and Safety Code. Unless you find beyond a reasonable doubt that the defendant had knowledge that the money was the result of a controlled substance transaction as specified in these instructions, you must find her not guilty."

■ Mitchell argues instructing the jury under CALJIC No. 12.37 that it may consider the expert opinion of a qualified controlled substances expert, created a preferential standard for such an expert, making CALJIC No. 2.80 prejudicially redundant. Her theory assumes the jury adopted the "specificity" of CALJIC No. 12.37 over the "generality" of CALJIC No. 2.80. She errs in her premise in at least two respects. CALJIC No. 12.37 does not create a preferential standard for qualified controlled substances experts, and its reference to such experts does not override the general rules for evaluating expert witness testimony set forth in CALJIC Nos. 2.80 and 2.83.

CALJIC No. 12.37 only instructs that the jury *"may consider all* of the evidence relevant thereto, *including but not limited to*: [¶] . . . Expert opinion of a qualified controlled substances expert as to the source of the assets." (CALJIC No. 12.37, italics added.) It does not tell the jury to consider such expert testimony more strongly than any other evidence, expert or otherwise. Nor does it purport to supersede CALJIC No. 2.80 in any way.

CALJIC No. 2.80 explains that in evaluating all expert witnesses, the jurors are *"not bound to accept an expert opinion as conclusive, but should give to it the weight to which* [they] *find it to be entitled."* (CALJIC No. 2.80.) The instruction tells the jury to consider the qualifications of an expert and allows it to reject any unreasonable opinion. It amplifies CALJIC No. 12.37 by presenting guidelines for the jury's evaluation of the opinion of a qualified controlled substances expert or any other expert.

CALJIC No. 2.83, which advises on resolving conflicts between conflicting expert testimony serves a similar function.[21] It implies that the opinion of one expert is not inherently better than another.

Mitchell attacks CALJIC No. 12.37 as violative of the general principle that " '[i]t is improper . . . for the court to single out a particular witness in an instruction, since by so doing the court charge becomes a comment on how the evidence should be considered, rather than a general instruction . . . .' [Citations.]" (*People v. Harris* (1989) 47 Cal.3d 1047, 1098-1099 [255 Cal.Rptr. 352, 767 P.2d 619].)[22] But the rationale behind the rule is revealed in *People v. Wright* (1988) 45 Cal.3d 1126 [248 Cal.Rptr. 600, 755 P.2d 1049], where the court said, "When the proposed instruction focuses

---

[21]CALJIC No. 2.83 provides: "In resolving any conflict that may exist in the testimony of expert witnesses, you should weigh the opinion of one expert against that of another. In doing this, you should consider the relative qualifications and credibility of the expert witnesses, as well as the reasons for each opinion and the facts and other matters upon which it was based."

[22]The rule has been applied primarily to defense evidence, but Mitchell argues with good cause it should apply to all testimony based on principles of fundamental fairness.

exclusively or primarily on the testimony of one witness, it runs afoul of a well settled corollary of the foregoing rule, i.e., that it is ' "improper for the court to single out a particular witness *and to charge the jury how his evidence should be considered.*" ' [Citation.]" (*Id.* at p. 1135, fn. 6, italics added.)

Although CALJIC No. 12.37 refers to "a qualified controlled substances expert," it does not identify who, if anyone, qualified for that role at the trial. It does not expressly limit the number of such witnesses who may testify. And, it does not suggest *how* such a witness's testimony should be considered. (See *People* v. *Wright, supra,* 45 Cal.3d at p. 1135, fn. 6.) CALJIC No. 12.37 does not run afoul of the rule.

Mitchell contends CALJIC No. 12.37 invades the province of the jury by inflating the credibility of a qualified controlled substances expert and impinging on its duty to make all credibility determinations. Our reasoning on Mitchell's last claim effectively disposes of this one.

■■■ Mitchell asserts the trial court should have instructed pursuant to CALJIC No. 2.02 on the sufficiency of circumstantial evidence to prove the specific intent required for a conspiracy conviction.[23] The court instructed on the specific intent necessary to establish the crime, the requirement of a concurrence of the required acts and intent, and gave CALJIC No. 2.01 on the sufficiency of circumstantial evidence generally.[24] The latter instruction conveys the same concepts as CALJIC No. 2.02 but does not focus on specific intent.

---

[23]CALJIC No. 2.02 provides: "The [specific intent] [or] [mental state] with which an act is done may be shown by the circumstances surrounding the commission of the act. However, you may not find the defendant guilty of the crime charged . . . unless the proved circumstances are not only (1) consistent with the theory that the defendant had the required [specific intent] [or] [mental state] but (2) cannot be reconciled with any other rational conclusion.

"Also, if the evidence as to [any] such [specific intent] [or] [mental state] is susceptible of two reasonable interpretations, one of which points to the existence of the [specific intent] [or] [mental state] and the other to the absence of the [specific intent] [or] [mental state], you must adopt that interpretation which points to the absence of the [specific intent] [or] [mental state]. If, on the other hand, one interpretation of the evidence as to such [specific intent] [or] [mental state] appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable."

[24]CALJIC No. 2.01 provides: "However, a finding of guilt as to any crime may not be based on circumstantial evidence unless the proved circumstances are not only (1) consistent with the theory that the defendant is guilty of the crime, but (2) cannot be reconciled with any other rational conclusion.

"Further, each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance upon which such inference necessarily rests must be proved beyond a reasonable doubt.

"Also, if the circumstantial evidence [as to any particular count] is susceptible of two reasonable interpretations, one of which points to the defendant's guilt and the other to [his]

A trial court does not err in refusing to give CALJIC No. 2.02 unless "the *only element of the offense* which rests substantially or entirely on circumstantial evidence is the element of specific intent or the mental state." (*People* v. *Bloyd* (1987) 43 Cal.3d 333, 352 [233 Cal.Rptr. 368, 729 P.2d 802], italics in original.) One of the elements of conspiracy is an agreement to commit an unlawful act and that may be proved by circumstantial evidence, as the jury was instructed. (CALJIC No. 6.12; see *People* v. *Towery* (1985) 174 Cal.App.3d 1114, 1132 [220 Cal.Rptr. 475].) There was no direct evidence Mitchell agreed to commit an unlawful act. Proof of it rested on circumstantial evidence.[25] The court did not err by failing to give CALJIC No. 2.02.

V-IX*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

The judgment is affirmed.

Sills, P. J., and Sonenshine, J., concurred.

A petition for a rehearing was denied December 31, 1994, and appellant's petition for review by the Supreme Court was denied March 15, 1995.

---

[her] innocence, you must adopt that interpretation which points to the defendant's innocence, and reject that interpretation which points to [his] [her] guilt.

"If, on the other hand, one interpretation of such evidence appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable."

[25]Mitchell argues she admitted she had an agreement with Manny to buy a plane for him. But the *unlawful* agreement in question was to knowingly possess drug money. Proof of that agreement was circumstantial.

*See footnote, *ante*, page 783.