Filed 1/13/26 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR


| | |
|---|---|
| In re HIEU HO TRONG THAI<br><br>on Habeas Corpus. | A170701<br><br>(Marin County<br>Super. Ct. No. HC0000051)<br><br>ORDER MODIFYING OPINION;<br>NO CHANGE IN JUDGMENT |


BY THE COURT:

The court orders that the opinion filed in this appeal on December 16, 2025, be modified as follows:


1. On page 12, in the first sentence of the third paragraph of footnote 11, delete "have pointed out" and replace with "explain below (see *post*, at p. 16)," so the sentence reads:

> About this suggestion, it suffices to say Thai's claim in this case is directed toward the calculation of his YPED, not his MEPD, and, as we explain below (see *post*, at p. 16), after *Hardin* we no longer focus on whether an equal protection claimant making a challenge to a law facially distinguishing between identifiable classes is similarly situated to a class claimed to have been more favorably treated (here those receiving MEPD credits).

1

The modification effects no change in the judgment.


Date: _____1/13/26_____        Signed: _____Brown_____P. J.

Trial Court:      Superior Court of California, County of Marin

Trial Judge:      Geoffrey M. Howard

Counsel:      Heather J. MacKay, under appointment by the Court of Appeal, for Petitioner Hieu Ho Trong Thai.

Rob Bonta, Attorney General, Sara J. Romano, Assistant Attorney General, Maria G. Chan and Krista L. Pollard, Deputy Attorneys General, for Respondent the People.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re HIEU HO TRONG THAI on Habeas Corpus. | A170701<br><br>(Marin County Super. Ct. No. HC0000051) |

## I.

Petitioner Hieu Ho Trong Thai, an inmate serving an indeterminate sentence of 45 years to life for first degree murder, filed a pro per habeas corpus petition raising certain statutory and constitutional claims challenging the timing of his initial youth offender parole hearing under Penal Code section 3051.[1]  The date of that hearing is linked to his "youth parole eligible date" (YPED) as defined in section 3051, subdivision (a)(2)(C).

Central to Thai's claims is the Public Safety and Rehabilitation Act of 2016 (Proposition 57, adding Cal. Const., art. I, § 32), a ballot initiative amending the California Constitution as a measure to ameliorate prison overcrowding, save costs, and avoid the potential for prison releases by federal court order.  (See Voter Information Guide, Gen. Elec. (Nov. 8, 2016) Prop. 57.)  Toward these ends, Proposition 57 gave the California Department of Corrections and Rehabilitation (CDCR) rulemaking

---

[1] All undesignated statutory references are to the Penal Code.

"authority to award [prisoners] credits earned for good behavior and approved rehabilitative or educational achievements." (Cal. Const., art. I, § 32, subd. (a)(2).)

In 2019, by amendment to regulations governing parole at title 15 of the California Code of Regulations (CDCR Regulations),[2] the CDCR exercised its Proposition 57 rulemaking authority, making certain credits available to advance the initial parole hearing dates of indeterminately sentenced prisoners. (CDCR Regs., § 3043 (Rule 3043).) By later amendment to these regulations in 2022 (Rule 3043, subd. (f)) (Rule 3043(f)), the CDCR permitted educational merit credits to be used in the calculation of the YPED, but disallowed the use of any other credits for that purpose. (*Ibid.*)

A counterpart to the YPED, known as the minimum eligible parole date (MEPD), is used by the CDCR in scheduling initial parole hearings for adult offenders who are serving indeterminate life sentences. The use of prison conduct credits in the calculation of the MEPD is more expansive than it is in the calculation of the YEPD. In addition to educational merit credits, four other categories of credits are used in the MEPD calculation. (Rule 3043, subd. (a) (Rule 3043(a)).)

Thai claims he is entitled to the same credits in the calculation of his YPED under Rule 3043(f) that other indeterminately sentenced inmates receive in the scheduling of their initial parole hearings using the MEPD. In a summary denial of his habeas petition last year, we rejected this argument, but the California Supreme Court granted review and transferred this case back to us, directing that we issue an order to show cause, which we have now done. Once again, we deny writ relief.

---

[2] California Code of Regulations, title 15, section 2000 et seq.

## A.

Under sections 3041 through 3044, a parole scheme that has been on the books in some form since 1941 (the section 3041 parole scheme) (see Stats. 1941, ch. 106, § 15, p. 1083), all inmates serving indeterminate life sentences are entitled to periodic parole hearings. (§§ 3041, subd. (a)(2), 3041.5, subd. (a)(6)); see *In re Sturm* (1974) 11 Cal.3d 258, 268.) For these inmates, the Board of Parole Hearings (CDCR Regs., § 2000, subd. (b)(10)) first considers parole suitability at an "initial parole hearing" (*id.*, §§ 2304, subd. (a), 2000, subd. (b)(78)) "[o]ne year before the inmate's minimum eligible parole date [MEPD]." (§ 3041, subd. (a)(2).)

The MEPD is "[t]he earliest date on which an [indeterminately sentenced life] or life prisoner may legally be released on parole." (CDCR Regs., § 2000, subd. (b)(67).) Because section 3046 places a statutory floor on the time indeterminately sentenced prisoners must serve, the MEPD is just what its title suggests, a minimum. (*In re Dannenberg* (2005) 34 Cal.4th 1061 ["Th[o]se [serving] indeterminate sentence[es] may serve up to life in prison, but they become eligible for parole consideration after serving minimum terms of confinement."].)[3]

---

[3] Under section 3046, subdivision (a), indeterminately sentenced prisoners must serve the greater of seven calendar years or "[a] term as established pursuant to any other law that establishes a minimum term or minimum period of confinement under a life sentence before eligibility for parole." (§ 3046, subd. (a)(1)–(2).) Absent specific authority in some "other law" allowing credits to be used to lower this floor, section 3046 sets an irreducible minimum. (§ 190, subd. (e) [barring use of in-prison credits to reduce minimum terms for those sentenced to indeterminate life terms for murder]; *In re Cervera* (2001) 24 Cal.4th 1073, 1075–1076, 1078 [same for three strikes offenders sentenced under §§ 667, subd. (e)(2)(A), 1170.12, subd. (c)(2)(A)]; *People v. Cervantes* (2017) 9 Cal.App.5th 569, 618–619, disapproved on another ground by *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 315 [same for one strike offenders sentenced under § 667.61].)

In 2013, the Legislature enacted section 3051, which codified an alternate parole scheme designed specifically for youth offenders (the section 3051 parole scheme). (Stats 2013, ch. 312, § 4.) The section 3051 parole scheme seeks to "bring California juvenile sentencing law into line with" a series of cases holding that the Eighth Amendment forbids the imposition of the death penalty[4] or imprisonment for a life term without the possibility of parole[5] on juveniles. (*People v. Hardin* (2024) 15 Cal.5th 834, 845 (*Hardin*).) "In language echoing the holdings of these cases, section 3051 provided for youth offender parole hearings at which the Board of Parole Hearings must provide 'a meaningful opportunity' for release (§ 3051, subd. (e)), giving 'great weight to the diminished culpability of youth as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity' (Pen. Code, § 4801, subd. (c).)" (*Id.* at p. 845; see *In re Brownlee* (2020) 50 Cal.App.5th 720, 725 (*Brownlee*).)

Under the section 3051 parole scheme, suitability for release is considered at youth offender parole hearings held on a calibrated timing schedule that is generally more accelerated than is the case for initial parole hearings held under section 3041. Section 3051, subdivision (a) "provides that, at a time designated in the statute, the Board of Parole Hearings must hold a parole hearing 'for the purpose of reviewing the parole suitability of any prisoner who was 25 years of age or younger . . . at the time of the controlling offense.' " (*Hardin, supra,* 15 Cal.5th at pp. 842–843.) The timing of the "initial youth offender parole hearing" (§ 3051, subd. (a)(2)(C))

---

[4] *Roper v. Simmons* (2005) 543 U.S. 551.

[5] *Miller v. Alabama* (2012) 567 U.S. 460; *Graham v. Florida* (2010) 560 U.S. 48; see *People v. Caballero* (2012) 55 Cal.4th 262.

under this scheme varies by age of offender and severity of the imposed sentence.

As pertinent here, the section 3051 parole scheme divides youth offenders into two tiers depending on their age at the time they committed a " 'Controlling offense' "[6] and the length of their minimum sentences. Tier one consists of indeterminately sentenced inmates with a minimum term of less than 25 years to life who were under age 26 at the time of committing a controlling offense, and tier two consists of indeterminately sentenced inmates with either a term of 25 years to life who were under age 26 at the time of committing a controlling offense or who were juveniles when they committed a controlling offense and received sentences of life without possibility of parole. (§ 3051, subd. (b)(2)–(4).)[7]

Section 3051 sets a staggered set of fixed statutory deadlines by which offenders in these two tiers must be considered for parole: The first day of the 20th year of incarceration (§ 3051, subd. (b)(2)) for tier one offenders, and the first day of the 25th year of incarceration for tier two offenders (§ 3051, subd. (b)(3)–(4)). The use of these specifically defined time periods eliminates the stacking effect consecutive sentences and sentence enhancements have on the wait times before indeterminately sentenced

---

[6] " 'Controlling offense' means the offense or enhancement for which any sentencing court imposed the longest term of imprisonment." (§ 3051, subd. (a)(2)(B).)

[7] There is a third tier with a deadline at 15 years from the first date of incarceration for determinately sentenced youth offenders who committed at controlling offense at age 25 or younger. (§ 3051, subd. (b)(1).) But that tier is irrelevant here, since we are dealing only with indeterminately sentenced inmates.

5

youth offenders are first considered for parole under the section 3041 parole scheme.

The "initial youth offender parole hearing" must occur within six months following the YPED. (§ 3051, subd. (a)(2)(C); CDCR Regs., § 2443, subd. (a).) The YPED is defined as "the earliest date upon which a youth offender is eligible for release on parole at a youth offender parole hearing." (§ 3051, subd. (a)(2)(C).) Thus, the timing of initial youth offender parole hearings under section 3051 is linked to the YPED, just as the timing of initial parole hearings for other indeterminately sentenced inmates under section 3041 is linked to the MEPD.

At parole hearings under both schemes, the applicable parole suitability criteria require consideration of the distinctive mitigating aspects of youth. (See § 4801, subd. (c); § 3051, subd. (f)(1).) But in at least one critical respect pertinent here, the two schemes are different: If a youth offender is found to be suitable for parole at a youth offender parole hearing, section 3041 subdivision (a)(4), expressly entitles the prisoner to early release notwithstanding the section 3046 minimum term.

## B.

"In November 2016, the California electorate approved Proposition 57. . . . The initiative amended the California Constitution to provide, in relevant part, that '[a]ny person convicted of a nonviolent felony offense and sentenced to state prison shall be eligible for parole consideration after completing the full term for his or her primary offense.' " (*In re Gadlin* (2020) 10 Cal.5th 915, 919.) Section 32, subdivision (b), of article I of the California Constitution directs the CDCR to "adopt regulations in furtherance of these provisions," and its subdivision (a)(2) specifically grants rulemaking "authority to award credits earned for good behavior and approved rehabilitative or educational achievements," but it does not specify

6

exactly what credits must be made available or to whom, how credits should be applied to accomplish the goals of rehabilitation and reintegration, and how credits should be applied in the parole process.

Legislatively authorized post-sentence conduct credits have long been available to most inmates in California prisons under Article 2.5 of Chapter 7 of Title 1 of Part 3 of the Penal Code (Article 2.5), but until Proposition 57 was passed, the CDCR regulations historically made these credits available only to inmates serving determinate sentences, subject to certain specific exceptions for some indeterminately sentenced inmates. (See CDCR Regs., former §§ 3042–3043, repealed as stated in Register 2017, No. 15 (Apr. 13, 2017).) In 2019, the Legislature revised section 3051, enacting amendatory language addressing the use of Article 2.5 credits by the CDCR as directed and authorized by article I, section 32 of the California Constitution. The legislation that added this amendment was Assembly Bill No. 965 in the 2019–2020 legislative session. (Stats. 2019, ch. 577, § 2 (Assembly Bill 965).)

Assembly Bill 965, as introduced, would have mandated that the fixed deadlines established for initial youth parole consideration "shall be reduced by the number of days earned of credits authorized by CDCR." (Assem. Com. on Public Safety, Rep. on Assem. Bill 965, as introduced Feb. 21, 2019, p. 1.) This form of the bill drew no distinctions among different kinds of credits and simply required that they all count toward reduction of the YPED. (Assem. Conc. in Sen. Amends. to Assem. Bill 965, as amended Aug. 30, 2019, at pp. 1–2.) In the face of objections, the final form of Assembly Bill 965, as enrolled, passed, and signed by the Governor, stated only that the CDCR "*may* authorize" an "earlier youth parole eligible date" in discharging its constitutional duty to promulgate regulations pursuant to

7

article I, section 32 of the California Constitution.  (§ 3051, subd. (j); Stats. 2019, ch. 577, § 2, italics added.)

The uncodified findings accompanying Assembly Bill 965 indicate that the Legislature considered whether it should direct that all Article 2.5 credits should be applied to the YPED, but ultimately elected to leave the choice of hearing-advancing credits to the CDCR's discretion.  Those findings state, "The purpose of this act is to incentivize rehabilitation by allowing people to advance their youth parole eligible date through earning credits, starting with educational merit credits, at the discretion of the Secretary of the [CDCR].  The Legislature recognizes that it is within the full discretion of the Secretary of the [CDCR] to determine *what, if any, credit earning programs shall apply* to an incarcerated person, including any and all credits to advance a youth parole eligible date."  (Stats. 2019, Ch. 577, §1(b), italics added.)

Following the enactment of Proposition 57 and the passage of Assembly Bill 965, the CDCR overhauled its credit earning scheme, replacing it at first with a set of emergency regulations operative as of spring of 2017, and ultimately with the final regulations that are now in effect.  (See CDCR Regs., §§ 3043–3043.6.)  Rule 3043—the regulation at issue in this case—is the currently operative version of the CDCR's longstanding "Credit Earning" rule.  It was promulgated pursuant to the constitutional rulemaking authority delegated to the CDCR under article I, section 32, subdivision (a) of the California Constitution.  Rule 3043 expands the availability of Article 2.5 credits in a number of ways, including, most importantly here, by permitting the use of these credits to advance section 3041 initial parole dates of all indeterminately sentenced inmates.

8

Just as the Legislature contemplated in passing Assembly Bill 965, the CDCR made a discretionary choice about what categories of Article 2.5 credits to utilize in the YEPD calculation. It amended Rule 3043, choosing to allow only educational merit credits (EMCs) (CDCR Regs., § 3043.5) to advance initial youth offender parole hearings in the section 3051 parole scheme by newly added Rule 3043(f), while continuing to allow four additional credit categories, good conduct credits (GGCs) (CDCR Regs., § 3043.2), milestone completion credits (MCCs) (*id.*, § 3043.3), rehabilitative achievement credits (RACs) (*id.*, § 3043.4), and extraordinary conduct credits (ECCs) (*id.* § 3043.6), to advance initial parole hearings in the section 3041 parole scheme under Rule 3043(a).[8]

In the notice-and-comment process that preceded the amendment of Rule 3043, many commenters criticized the CDCR's failure to include GCCs, MCCs, RACs, and ECCs in the YPED as unfair, since it deprived inmates of the accelerating effect these forms of earned credit would have on the scheduling of initial youth offender parole hearings, contrary to the intent of Proposition 57.[9] In response, the CDCR explained that, unlike EMCs—one-

---

[8] The CDCR drew this distinction by amending Rule 3043 to add subdivision (f) effective January 1, 2022. (See Rule 3043, adding new subdivision (f), Register 2021, No. 51.)

[9] Pursuant to Government Code section 11346.8, the CDCR published an Initial Statement of Reasons (ISOR) on March 18, 2022, supporting the adoption of its proposed amendments to Rule 3043, and pursuant to Government Code section 11346.9 it published a Final Statement of Reasons (FSOR) on October 13, 2022, along with its adoption of the proposed amendments. (CDCR, ISOR NCR 22-05, Mar. 18, 2022; CDCR, FSOR NCR 22-05, Oct. 13, 2022.) Government Code section 11346.2, subdivision (b)(1) states that an initial statement of reasons shall include "the specific purpose of each adoption . . . and the rationale for the determination by the agency

9

time, infrequently earned credits that are not subject to forfeiture—these other forms of credit are constantly changing and would be difficult to track accurately in the complex process of scheduling parole hearing dates. (FSOR, *supra*, at pp. 2–4.) The inclusion of only EMCs in the YPED formula was justified as a way to "balance the goal of incentivizing youth offenders with the [CDCR's] operational need to eliminate fluctuation of the YPED that could occur due to credits earned or lost," thus promoting "certainty" and stability in the process of scheduling youth offender parole hearings. (ISOR, *supra*, at pp. 3, 7; FSOR, *supra*, at p. 3.)[10]

## C.

The heart of Thai's complaint in this case—which he frames both as a matter of regulatory interpretation and constitutional demand—is that he is entitled to the same credits to advance his initial youth offender parole hearing under section 3051 that nonyouth inmates serving indeterminate terms can earn to advance their initial parole hearings under section 3041. That presents essentially the same issue the Legislature considered but declined to resolve in Assembly Bill 965, and that drew critical comment in the notice-and-comment process preceding the CDCR's 2022 amendment of

---

that each adoption . . . is reasonably necessary to carry out the purpose and address the problem for which it is proposed." The FSOR is in the record as an exhibit to the Attorney General's return. We take judicial notice of the ISOR on our own motion. (Evid. Code, §§ 452, subd. (c), 459.)

[10] Amplifying this reasoning in response to one of these comments, the CDCR explained in the ISOR, "the proposed regulations' application of EMC in the YPED calculation will not be affected by credit losses or restorations. In contrast, other credits described in the department's regulations, such as [GCCs], [MCCs], [RACs], [ECCs], and Minimum Security [credits] could apply multiple times per year and are subject to broader credit forfeitures, both of which inject significant uncertainty into operational scheduling." (ISOR, *supra*, at p. 3.)

10

Rule 3043. The nub of Thai's argument is this: Because "the [CDCR] should be encouraging good conduct and positive programming, rehabilitative treatment, and educational achievements among both youthful and non-youthful offenders, there is no compelling or rational reason to afford sentence-reducing credits to one group but deny those credits to the other group."

To illustrate the effect of this alleged disparate treatment in his case, Thai claims that, because Rule 3043(f) deprives him of the accelerating effect of GCCs, MCCs, RACs, and ECCs, he has "lost thousands of days of credits" in the calculation of his YPED compared to the credits he received in the calculation of his MEPD. He has given us nothing specific to show what that means in terms of the timing of his initial youth offender parole hearing. But our review of the record suggests fairly clearly what is at stake in the side-by-side comparison he invites us to consider (a YPED calculation in which he receives the benefit of EMCs only, versus one in which he receives GCCs, MCCs, RACs, and ECCs as well). Using the credits reported on his MEPD worksheet, and then transposing those credits onto his YPED calculation, the hypothetical YPED he implicitly posits would give him an additional twelve years of YPED acceleration, beyond the nine years he has already received ahead of his MEPD.[11] Thus, as a

_____

[11] Thai's YPED is in 2028, and his MEPD is in 2037, at least as the parties report those dates to us. Whether his reported YPED and MEPD are correct in light of the recent decision in *Criminal Justice Legal Foundation v. Department of Corrections and Rehabilitation* (2025) 113 Cal.App.5th 26, rev. granted, Oct. 22, 2025, S292887 (*CJLF*), is not at issue in this case. Even under the holding in *CJLF*—which calls into question whether Rule 3043 is void as to many indeterminately sentenced inmates—we understand that Thai still contends some other group of

practical matter—were we to hold that he must be given the benefit of all five categories of credits—he would be entitled to an immediate youth offender parole hearing, rather than one in 2028.

## II.

In support of his petition, Thai advances two primary lines of argument. First, continuing to press the lead argument made in his pro se habeas petition, Thai argues that the phrase "initial youth offender parole hearing" under section 3051, subdivision (a)(2)(C) refers to an "initial parole hearing" within the meaning of Rule 3043(a), CDCR's credit-earning regulation, for all indeterminately sentenced parole-eligible inmates.

---

indeterminately sentenced inmates is being treated more favorably than he is under Rule 3043(f), without a constitutionally sufficient justification.

The Attorney General acknowledges that *CJLF* is "not precisely on point" and observes that it may be a while before the remittitur issues, which seems correct given the recent grant of review in that case. Still, assuming *CJLF* will remain good law following Supreme Court review and in the meantime should be followed, the Attorney General suggests that *CJLF*'s holding "undercuts" the premise of Thai's equal protection claim because it voids any regulation that purports to reduce his "45-year MEPD" as a convicted first degree murderer or that gives him greater "credits to advance his MEPD" than are available to any defendant who received a sentence imposed under section 12022.53, subdivision (i), as was Thai's sentence.

About this suggestion, it suffices to say Thai's claim in this case is directed toward the calculation of his YPED, not his MEPD, and, as we have pointed out, after *Hardin* we no longer focus on whether an equal protection claimant making a challenge to a law facially distinguishing between identifiable classes is similarly situated to a class claimed to have been more favorably treated (here those receiving MEPD credits). Thai's dual status as a recipient of both a YEPD and an MEPD is notable as part of the factual backdrop here, as we explain below. But it is legally irrelevant what categories of Article 2.5 credit indeterminately sentenced inmates are eligible to receive in the MEPD calculation, so long as there is a constitutionally justifiable basis for treating youth inmates differently than adult inmates.

12

Second, with the benefit of assistance of appointed counsel following remand from the Supreme Court, he offers a more fully developed constitutional attack on Rule 3043 than he advanced in his pro se petition as originally filed in this court. His primary constitutional argument is that, because Rule 3043(f) permits only one category of credits to be used in the calculation of the YPED for youth offenders, while Rule 3043(a) permits four additional categories of credit to be used in the calculation of the MEPD for other indeterminately sentenced inmates, the disparate treatment of these two groups in Rule 3043 violates equal protection. He also makes a due process argument.[12]

## A.

Turning to Thai's regulatory interpretation argument first, there is no merit to his claim that the "initial parole hearing date" in Rule 3043(a), is the " 'initial' or 'first true [parole] hearing.' " Positing that the "initial parole hearing" for all indeterminately sentenced inmates under Rule 3043(a) must be interpreted to mean the MEPD-determined hearing date or the YPED-determined hearing date, *whichever occurs first*—hence his use of the phrase "first true hearing"—Thai contends that credits must be treated identically in calculating both dates.

We reject this argument for two reasons. First, Thai ignores the words in Rule 3043(a) referencing section 3041, subdivision (a)(2). Rule 3043(a) expressly states that certain specified credits shall "advance an incarcerated person's initial parole hearing date *pursuant to subdivision*

---

[12] In alleging equal protection and due process violations, Thai's pro se petition for habeas corpus does not distinguish between the federal and state constitutions. In his traverse, he makes clear that he is basing these constitutional claims on both the United States Constitution and the California Constitution.

13

*(a)(2) of section 3041 of the Penal Code.*"  (Italics added.)  Second, Thai ignores the first sentence in section 3051, subdivision (a)(2)(C), which provides that the YPED is "the earliest date upon which a youth offender is eligible for release on parole *at a youth offender parole hearing.*"  (Section 3051, subd. (a)(2)(C), italics added.)

The basic error in Thai's argument equating the term "initial parole hearing" in Rule 3043(a) with the term "initial youth offender parole hearing" in 3051, subdivision (a)(2)(C) is that these terms implement two separate statutory schemes, one governing parole consideration generally for indeterminately sentenced parole-eligible inmates (§ 3041 et seq.) and one governing parole consideration specifically for youth offenders (§ 3051 et seq.).  The CDCR's definition of the term "initial parole hearing" for purposes of the section 3041 parole scheme cannot be imported into the section 3051 parole scheme simply because the term "initial parole hearing" in Rule 3043(a) sounds similar to the term "initial youth offender parole hearing" in section 3051, subdivision (a)(2)(C).  The context is not the same.

## B.

Turning next to Thai's equal protection claim, "The equal protection clause of the Fourteenth Amendment . . . is 'essentially a direction that all persons similarly situated should be treated alike.'  [Citation.]  'At core, the requirement of equal protection ensures that the government does not treat a group of people unequally without some justification.'  [Citation.] [¶] The degree of justification required to satisfy equal protection depends on the type of unequal treatment at issue." (*Hardin*, *supra*, 15 Cal.5th at p. 847; *id*. at p. 848 ["In a case, like this one, subject to rational basis review, the question is 'whether the challenged classification ultimately bears a rational relationship to a legitimate state purpose.' "].)

14

"Courts apply heightened scrutiny when a challenged statute or other regulation involves a suspect classification such as race, or a fundamental right such as the right to vote, and accordingly will demand greater justification for the differential treatment. [Citations.] But when a statute involves neither a suspect classification nor a fundamental right, the 'general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.' [Citations.] A court applying this standard finds 'a denial of equal protection only if there is no *rational* relationship between a disparity in treatment and some legitimate government purpose.' " (*Hardin, supra,* 15 Cal.5th at p. 847, original italics.) The standard is highly deferential. To overcome the presumption of validity, a challenger must "show[] that no rational basis for the unequal treatment is reasonably conceivable.' " (*Id.* at p. 852.)

Applying these principles in *In re Nguyen* (2024) 107 Cal.App.5th 15 (*Nguyen*), a Second District, Division Three panel analyzed and rejected an argument similar to the equal protection claim Thai now makes in this case—that it is an equal protection violation for the CDCR to calculate the YPED utilizing only one of five categories of credits Rule 3043 makes available to indeterminately sentenced nonyouth inmates in the setting of their initial parole hearing dates. (*Nguyen*, at pp. 24–29.) In that case, petitioner "Nguyen claim[ed] that the difference in how the department awards credits against an inmate's MEPD and YPED violates equal protection" and "assert[ed] that youth and nonyouth offenders are similarly situated." (*Id.* at pp. 24, 25.)

Petitioner Nguyen mounted a *facial* equal protection challenge, as Thai does in this case. At the threshold first step of its equal protection

15

analysis, the *Nguyen* panel found that the two groups who were allegedly treated differently—"youth and nonyouth offenders"—are not "similarly situated" for purposes of Rule 3043(f). (*Nguyen*, at pp. 25–27.) It then went on to hold that, in any event, "[b]ased on the already significant benefit afforded only to youth offenders" and section 3051's fixed variables for accelerating youth parole eligibility hearings, "the [CDCR] could rationally conclude that youth offenders should not benefit further from an award of credit other than educational merit credit." (*Nguyen*, at p. 28.)

We agree with *Nguyen* that rational basis review applies, but we ultimately reject Thai's equal protection challenge for different reasons. Most importantly, we do not employ the two-step approach to analyzing equal protection claims that our Supreme Court jettisoned in *Hardin* for cases, like this one, where the classification at issue appears on the face of the challenged law. (*Hardin, supra*, 15 Cal.5th at pp. 848-851.) Instead, we first ask whether we are dealing with a classification that treats two groups unequally, and if so, whether " 'the challenged classification ultimately bears a rational relationship to a legitimate state purpose.' " (*Id.* at p. 848.) And in applying this test, we bear in mind that Thai must show a constitutional defect not only in his case but " 'in the generality or great majority of cases.' " (*People v. Buenrostro* (2018) 6 Cal.5th 367, 388, italics omitted.)

### C.

Thai acknowledges the considerable number of cases applying rational basis review to equal protection challenges based on disparate treatment of prisoners in awarding entitlement to presentence credits of various kinds. But he contends those cases either assume rational basis review applies without explanation (see *In re Kapperman* (1974) 11 Cal.3d 542, 545–546) or are inapposite because they involve retroactivity issues (*In re Stinnette*

16

(1979) 94 Cal.App.3d 800, 805 & fn. 4; *In re Bender* (1983) 149 Cal.App.3d 380, 389; *People v. Rajanayagam* (2012) 211Cal.App.4th 42, 53–56). He is right that none of these cases directly addresses the applicable standard of review, but even if these cases do assume the applicability of rational basis review without analysis, we believe they assume correctly.

What we are dealing with here is the timing of Thai's statutorily mandated youth offender parole hearing, not the manner in which such a hearing is held or the outcome of it. He has no state-granted right to release on parole on any particular date. In the context of parole, courts have applied fundamental rights analysis only when parole has already been granted. It was long ago established in cases involving *revocation* of parole—where a person stands to be stripped of rights previously granted— that a constitutionally protected liberty interest is implicated. (See *Morrissey v. Brewer* (1972) 408 U.S. 471; *Gagnon v. Scarpelli* (1973) 411 U.S. 778.) At stake here, by contrast, is *when* Thai is entitled to a parole hearing. That is not comparable to a person's interest in maintaining previously granted freedoms. (See *In re Rosenkrantz* (2002) 29 Cal.4th 616, 656 ["An incarcerated individual for whom a parole date has not been set possesses less of an expectation of liberty than one for whom a release date previously has been established by the Board."].) In going before the Board of Parole Hearings for a parole suitability determination, there are constitutional guardrails[13] but no guarantees.

Arguing for strict scrutiny, Thai relies principally upon *People v. Olivas* (1976) 17 Cal.3d 236. In that case, a juvenile offender brought a

---

[13] See e.g. *In re Lawrence* (2008) 44 Cal.4th 1181 (due process); *In re Palmer* (2021) 10 Cal.5th 959 (excessive punishment).

17

successful equal protection challenge to the withholding of conduct credits that, if applied, would have shortened his maximum term of institutional commitment as a ward of the Youth Authority. Concluding that the challenge implicated a fundamental liberty interest, the court applied strict scrutiny and found no compelling governmental interest for withholding the credits by age classification. As we recognized recently in *People v. Batten* (2025) 109 Cal.App.5th 908, 913, however, the holding in *Olivas* has been limited by subsequent decisional law.[14] In due process cases (see *In re Rosenkrantz, supra*, 29 Cal.4th at p. 656), and—of most direct significance here—in equal protection cases (*People v. Williams* (2024) 17 Cal.5th 99, 123–124; *People v. Wilkinson* (2004) 33 Cal.4th 821, 838), our Supreme Court has consistently held that a criminally convicted person facing incarceration " ' "does not have a fundamental interest in a specific term of imprisonment." ' " (*Hardin, supra*, 15 Cal.5th at pp. 847–848.)

In addition to *Olivas*, Thai cites a line of cases involving equal protection challenges mounted by defendants who claimed entitlement to presentence credits for conduct while in some form of rehabilitative treatment (*People v. Shkrabak* (2023) 89 Cal.App.5th 943; *People v. Yang* (2022) 78 Cal.App.5th 120; *People v. Sage* (1980) 26 Cal.3d 498; *In re Huffman* (1986) 42 Cal.3d 552; *People v. Waterman* (1986) 42 Cal.3d 565; *People v. Caruso* (1984) 161 Cal.App.3d 13); while in county jail rather than state prison (*People v. Sandoval* (1977) 70 Cal.App.3d 73); or while in youth custody (*People v. Reynolds* (1981) 116 Cal.App.3d 141). In all of these cases, the conduct credits at issue were "not related to a discretionary grant

---

[14] Other courts have made the same observation. See, e.g., *People v. Morrison* (2025) 110 Cal.App.5th 702, 716; *People v. Bell* (1996) 45 Cal.App.4th 1030, 1048; *People v. Mitchell* (1994) 30 Cal.App.4th 783, 794–795; *People v. Silva* (1994) 27 Cal.App.4th 1160, 1167–1168.

of parole." (*People v. Sage*, at p. 508, fn. 6.)  Rather, the credits were claimed in order to reduce a determinate prison term or some other maximum term of confinement.  These cases, too, like *Olivas*, are distinguishable.

**D.**

On the merits, we reject Thai's equal protection claim on the ground that "there is a rational basis justifying" Rule 3043(f)'s inclusion of only EMCs in the YPED calculation.  (See *Hardin, supra*, 15 Cal.5th at p. 851.)  Here, Thai faces a daunting hurdle.  "Under th[e] deferential [rational basis] standard, . . . [t]he underlying rationale for a [challenged] classification need not have been 'ever actually articulated' by lawmakers, nor 'be empirically substantiated.' [Citation.]  Evaluating potential justifications for disparate treatment, a court reviewing a statute under this standard must 'treat the statute's potential logic and assumptions far more permissively than with other standards of constitutional or regulatory review.' " (*Hardin, supra*, 15 Cal.5th at p. 852.)  Thai fails to bear his burden of showing that the disparate treatment at issue here lacks a rational basis.

**1.**

We begin with the same observation the *Nguyen* panel made about the petitioner in that case.  Because Thai is an indeterminately sentenced prisoner who committed a controlling offense when he was under the age of 26, he is in both relevant groups for purposes of equal protection analysis—indeterminately sentenced youth offenders, as well as the broader group of indeterminately sentenced inmates (of which the first group is but a subset)—and thus he has been given both a YPED *and* an MEPD.

This is where our analysis departs from the approach taken in *Nguyen*.  The panel there grounded its "similarly situated" analysis on the fact that Thai is in both the youth and nonyouth pool of parole-eligible

19

inmates.  (*Nguyen, supra,* 107 Cal.App.5th at pp. 26–27 ["Nguyen is . . .
eligible for all types of credit; the only difference is in which credits are
counted against his MEPD versus his YPED.  There is no similarly situated
group that is being treated differently from any group to which Nguyen
belongs."].)  We think Thai's dual status as a YPED- and MEPD-eligible
prisoner is significant not as an indicium of lack of similarity to adult
offenders as a class, but because his receipt of both a YPED and an MEPD
demonstrates we are dealing with two different parole programs, one
administered under the section 3041 parole scheme, and one administered
under the section 3051 parole scheme.  And under both schemes, "a youth
offender parole hearing is simply one type of parole hearing."  (*Brownlee,*
*supra,* 50 Cal.App.5th at p. 725.)

In some cases, depending on the sentence or sentences a particular
inmate receives—take as an example an inmate sentenced to an
indeterminate sentence of 15 years to life for second degree murder with no
enhancements (where the MEPD could be set as early as the end of year
fifteen under section 3041, subdivision (a)(2), while the YPED for someone
with the same conviction and sentence could be set no later than the first
day of year twenty under section 3051, subdivision (b)(2))—the MEPD may
occur before the YPED.  The timing of conviction may also result in the
MEPD occurring first.  Indeed, that is what happened in *Brownlee,* where
the petitioner's MEPD-driven initial parole hearing under section 3041,
subdivision (a)(2) occurred years before the enactment of section 3051, and
thus predated the existence of YPEDs.  In other cases, perhaps most cases
given how common aggregate sentences are, with different combinations of
sentence enhancements and consecutive sentences accompanying one or

20

more indeterminate sentences, the YPED will occur before the MEPD, often long before.

Laying great stress on the now constitutionally enshrined priority of promoting rehabilitative activity through the use of credits, Thai contends it makes no sense to "provide full credit incentives for adult offenders to engage in rehabilitation while greatly limiting those incentives for youth offenders." He argues that, because Rule 3043(f) withholds four categories of credits, he has been deprived of the opportunity to have an earlier initial youth offender parole hearing than the 20- and 25-year deadlines in 3051, subdivisions (b)(2) to (b)(4) would allow, as accelerated by credits, if those additional credit categories were available to him. He sees no reason why he should not have the same degree of control over the timing of his YPED-driven initial youth offender parole hearing under section 3051 that a nonyouth offender has over an MEPD-driven initial parole hearing under section 3041. The flaw in this line of argument is that the section 3051 parole scheme is not designed to promote acceleration of youth offender parole hearings for its own sake. "The faster the better" may make sense as an abstract proposition, but it is not an accurate description of the timetable for initial hearings under section 3051, which is fundamentally governed by the fixed determinants of age at time of offense and length of sentence.

Nor is the section 3051 parole scheme designed to achieve acceleration of YPED-driven initial parole hearings in some sense relative to the scheduling of MEPD-driven initial parole hearings—that is, to ensure youth offenders are always scheduled for accelerated initial hearings on a preference basis compared to nonyouth inmates under section 3041. The relative timing of an initial parole hearing under the section 3041 and section 3051 parole schemes cannot be generalized. Because there may be

21

situations where an initial parole hearing under section 3041 occurs before an initial youth offender parole hearing, the section 3051 parole scheme is agnostic as to the degree of earned advancement of initial parole hearings as between the two systems.  Even if, in practice, most YPED-driven initial parole hearings occur first, neither parole scheme sets up a race in which the speed of scheduling—to the degree it is within an inmate's control through credit-earning—must be the same for all participants in both systems.  The constitutional logic of equal treatment does not demand identical handling of hearing-accelerating credits within these two separate parole schemes any more than it requires that all hearings under section 3041 and section 3051 must take place at the same place or on the same day of the week.

## 2.

Emphasizing that the rulemaking authority on which Rule 3043(f) is founded derives ultimately from Proposition 57, Thai sets up his own framing of the governmental purpose he proposes to have us use in evaluating whether there is a rational relationship between the classification at issue and the governmental objective Rule 3043(f) seeks to further.  According to him, we should evaluate Rule 3043 solely as a credit-earning regulation whose purpose is to promote maximum rehabilitative activity, divorced from the specific context in which earned credits under it are used.  Using that prism, he argues it was irrational to deploy credits differently in the section 3041 and section 3051 parole schemes, since all indeterminately sentenced inmates should be equally incentivized to engage in good conduct that may lead to release on parole.  For the CDCR to treat youth and nonyouth inmates differently under Rule 3043, in his view, is

contrary to the express purpose of article I, section 32 of the California Constitution.

Although we are not bound to accept Thai's characterization of the governmental objective at stake here, we reject his facial equal protection attack on Rule 3043 on its own terms. What Thai complains about is a classic problem of underinclusion. Having exercised its Proposition 57 rulemaking authority to advance the MEPD-driven initial parole hearings for a class of nonyouth indeterminately sentenced inmates by making five categories of Article 2.5 credits available to them, he claims it is an equal protection violation to treat youth offenders unequally by giving them only one category of Article 2.5 credits to advance initial youth offender parole hearings.

We disagree. Here, our analysis turns on one of the central teachings of *Hardin*. In that case, defendant Hardin offered an account of the governmental objective at stake in which the sole purpose of section 3051 was to ensure that "young persons [have] the opportunity to obtain release based on demonstrated growth and rehabilitation." (*Hardin, supra,* 15 Cal.5th at p. 854.) Rejecting such a narrow view of the governmental objective implicated there, the court saw a more nuanced governmental objective, one that sought to accommodate multiple concerns, including calibration of benefits conferred on different groups of youth offenders by their culpability as denoted by the severity of imposed sentences. (*Id.* at pp. 853–857.)

The court derived this objective from section 3051's text, structure, and history. (See *Hardin, supra,* 15 Cal.5th at p. 857 ["the Legislature balanced multiple considerations, including both concerns about increasing opportunities for release for young adults able to show growth and maturity

23

and concerns about calibrating the level of punishment appropriate for certain serious criminal offenses"].)  Mindful that the section 3051 parole scheme is designed to accommodate multiple, sometimes competing priorities, the *Hardin* court recognized that the Legislature sought to strike a balance.  The exclusion of young adults who committed special circumstance murder—"an offense deemed sufficiently culpable that it merits society's most stringent sanctions"—helped to strike that balance, the court concluded.  (See *Hardin*, at p. 864.)

So, too, we have multiple goals in play here, as is evident from the text, structure, and history of Rule 3043(f), which we read in light of Rule 3043's role as an implementing regulation designed to further the goals of section 3051 and Proposition 57 simultaneously.  Like defendant Hardin, Thai invites us to focus solely on a single governmental objective.  His proffered governmental objective, derived exclusively from Proposition 57, is the maximum promotion of rehabilitative activity through the use of hearing-advancing credits.  But Thai makes the same type of analytical mistake defendant Hardin made.  Promotion of all forms of rehabilitation is not the only goal the CDCR may rationally have been seeking to achieve when it drew the distinction it did in Rule 3043(f).

In applying Rule 3043 to two distinctly different parole systems, one under section 3041, and one under section 3051, the CDCR had to consider the different ways in which those two systems operate and accommodate the differences in how it reconciled the use of credits within each one.  Looking at the "the apparent motivation[] underlying the challenged classification" "revealed in the statutory text and history" (*Hardin*, *supra*, 15 Cal.5th at p. 852, fn. 3)—as revealed not just by Proposition 57, but considering Proposition 57 together with Assembly Bill 965 and the regulatory

24

objectives the CDCR is charged with implementing under section 3051—we think that, when the CDCR decided how to integrate Article 2.5 credits into a parole scheme in which the timing of initial hearings under the section 3051 scheme, it could rationally have concluded that including only EMCs in the YPED calculation under Rule 3043(f) was appropriate for reasons specific to youth offenders.

On the premise that EMCs provide a uniquely valuable incentive for participation in what may be the most important form of rehabilitative activity available to any offender—self-improvement through education—we can envision the CDCR thinking it was appropriate to offer an incentive tailored to youth offenders by enhancing the built-in advantage this class of inmates already enjoys in the scheduling of initial youth parole hearings (a legislatively-conferred advantage that arises from the fact that only youth offenders, as a class, receive the benefit of the fixed section 3051, subdivision (a)(2) deadlines). To accomplish this goal for youth offenders, it seems logical the CDCR might have decided to use EMCs as a singularly powerful reward that holds out the possibility of accelerated initial youth offender parole hearings on a schedule even faster than section 3051, subdivision (a)(2), otherwise permits.

Granted, this "special" incentive offered to youth offenders might have been even greater had all five categories of credits been included in the YPED calculation, but calibrating the strength of the reward offered under Rule 3043(f) and focusing on a particular kind of good conduct—educational programming—was the CDCR's policy decision to make. And in any event, the omission of GCCs, MCCs, RACs, and ECCs seems reasonable enough since, at some point, these other categories of Article 2.5 credits must be taken into account in the parole suitability determination anyway,

25

regardless of when initial parole consideration occurs. In the end, whether the challenged omission was a "good" policy choice is beside the point. For equal protection purposes, it is enough that the choice the CDCR made is rationally tethered to some legitimate governmental purpose. Applying the any conceivable justification analysis to the governing statutory scheme and the regulatory history behind Rule 3043(f) in mind, we conclude that it is.

**3.**

Although the CDCR had no obligation to come forward with evidence to justify its disparate treatment of Thai compared to indeterminately sentenced adult offenders, it did so in this case. A declaration submitted by Jennifer Shaffer, the Executive Officer of the Board of Parole Hearings, points to the operational difficulty of tracking GCCs, MCCs, RACs, and ECCs for purposes of the YPED and the scheduling difficulties that would ensue if all the continuously changing variables affecting those credits had to be taken into account and constantly updated in real time. According to Shaffer, "YPEDs are manually established by Department staff and entered into the Board's Information Technology System (BITS) based on when the youth offender is expected to have served 15, 20, or 25 years of incarceration (depending on the sentence imposed by the court). . . . BITS was not designed to calculate and contemporaneously track changes to parole eligibility dates from the continuous and fluctuating award, forfeiture, and restoration of credits."

By contrast, all five categories of conduct credits used to determine MEPDs are tracked electronically. Shaffer's declaration provides some technical explanation for why only limited credits are used in setting YPEDs. According to her, MEPDs are set using a database called the "Strategic Offender Management System (SOMS)." Shaffer explains that,

upon consultation with her staff, she holds the view that "(1) it is impossible to update SOMS as it currently exists to track YPEDs" using all the variables to which Thai claims entitlement "without significant risk to the entire SOMS system; (2) it is likely SOMS would need to be replaced with a completely new system to establish, store, and recalculate multiple parole eligible dates for an incarcerated person as credits are applied, forfeited, and restored; and (3) a replacement system was estimated to cost tens of millions dollars, and would take years to design and implement." In his traverse, Thai requests that we remand for factfinding on the issues raised in the Shaffer declaration. We decline that invitation.

Our analysis of hypothetically plausible reasons for the distinction CDCR drew between credit-earning under Rule 3043(a), on the one hand, and Rule 3043(f), on the other, makes it unnecessary to rely on the Shaffer declaration. While we recognize and appreciate that policymakers may have a felt need to explain themselves in the face of constitutional challenge, we believe the facial equal protection analysis here should focus on the background framework of enacted law—as noted above, Proposition 57, Assembly Bill 965 and the section 3051 parole scheme as a whole. A hindsight explanation of intent from a policymaker may be useful in some circumstances as a tool for discerning whether a challenged law passes the rational basis test, but we prefer to rely upon more conventional indicia of governmental intent in this case.

Now, to be sure, we see nothing in *Hardin* or any other equal protection precedent that *prohibits* government officials from offering their actual reasons for creating a classification by statute or regulation, since, in undertaking the search for any conceivable justification in a rational basis case, courts are presumably free to make use of whatever sources of

27

information might shed light on the " 'potential logic and assumptions' " (*Hardin, supra*, 15 Cal.5th at p. 852) of a challenged classification. But such an approach may also create issues of procedural fairness. For an appellate court in a habeas proceeding to entertain an after-the-fact evidentiary showing of actual reasons for a legislative or regulatory classification may invite a factual contest, as it has here. It is unnecessary to grapple with that problem on this record. To the extent the CDCR's actual reasons may be considered a valid basis for upholding Rule 3043(f) in this case, we are satisfied that the reasons the CDCR proffered contemporaneously with the adoption of Rule 3043 in the regulatory notice-and-comment process are adequate to explain why it included only EMCs under Rule 3043(f).

As the CDCR explained in the ISOR and the FSOR setting forth its reasons for the adoption of amendments to Rule 3043 in 2002, the inclusion of only EMCs in the YPED formula was justified as a way to "balance the goal of incentivizing youth offenders with the [CDCR's] operational need to eliminate fluctuation of the YPED that could occur due to credits earned or lost," thus promoting "certainty" and stability in the process of scheduling youth offender parole hearings. (ISOR, *supra*, at pp. 3, 7; FSOR, *supra*, at p. 3.) We take the rationale provided by the CDCR in the ISOR and the FSOR to be similar to the role that legislative history plays in rational basis review of a statute. The CDCR's contemporaneously stated reasons for amending Rule 3043—which are consistent with the more detailed after-the-fact explanation in Ms. Shaffer's declaration, but do not place cost and fiscal impact in the foreground—supply a rational basis for the CDCR's differential treatment of Thai in the calculation of his YPED, as compared to its treatment of all indeterminately sentenced adult offenders in the calculation of MEPDs.

A quick scan of the governing statutes and regulations shows why the concerns stated in the ISOR and the FSOR are rationally grounded. Section 3041 and section 3051 are just two among several different parole systems the CDCR administers for determinately and indeterminately sentenced inmates, as well as for various subgroups such as elderly prisoners and prisoners serving sentences for nonviolent offenses.[15] Drawing some reasonable inferences about the practical impact of including GCCs, MCCs, RACs, and ECCs in the YPED calculus, the potential administrative scramble in the hearing scheduling process across different type of parole schemes is not hard to see. Consider, as a point of comparison, the manifold challenges our trial courts face when dealing with speedy trial demands, which must be handled while accommodating many other types of calendar preference, not to mention routine case management efficiency in the general run of nonpreference cases.

If some significant number of youth offenders were suddenly entitled to immediate youth offender hearings—as Thai appears to claim here—it is conceivable that the Board of Parole Hearing's ability to hold timely hearings for a broad range of inmates could be compromised. Rational basis review requires no factfinding on this point. Accordingly, whether we look to purely hypothetical reasons the CDCR may have had for the inclusion of only EMCs under Rule 3043(f), or we draw some straightforward inferences from the actual reasons the CDCR provided in the notice-and-comment process preceding its adoption of Rule 3043(f), we conclude that the CDCR was amply justified to include only EMCs in the YPED calculation.

---

[15] CDCR Regulations, section 2449.40 et seq. (elderly prisoner parole scheme); *id*., section 2449.1 et seq. (prisoner parole regulations for nonviolent offenders).

While we perceive some logic to why the CDCR may have distinguished between youth and nonyouth inmates for purposes of Rule 3043 credit earning in the implementation of the section 3051 parole scheme, we hasten to add that we are not endorsing the policy choice the CDCR made in restricting hearing-advancing credits available to youth offenders under Rule 3043(f). Here, we note that, in wrapping up its rational basis analysis, the *Hardin* court explained: "We are . . . mindful that the legislative branch is entitled to proceed incrementally, so long as it proceeds rationally, in 'walking [the] tightrope' of the political process. [Citation.] Our task is limited to determining whether Hardin has shown that the Legislature's decision to expand youth offender parole hearings to most young adult offenders, while excluding Hardin and others similarly situated, violates equal protection under a rational basis standard. . . . [W]e cannot so conclude." (*Hardin*, *supra*, 15 Cal.5th at p. 866.) So, too, in this case. While we are dealing with a different kind of governmental choice than the *Hardin* court did (one made by the CDCR instead of the Legislature), as the Supreme Court said there, "the question before us concerns only the constitutional permissibility of the lines the [CDCR] has drawn. It is not for us to pass judgment on the wisdom or desirability of its policy choices." (*Hardin*, *supra*, 15 Cal.5th at p. 864.)

We do find it notable that nowhere in the actual justifications offered for the Rule 3043(f) YPED calculation—as articulated in the ISOR, the FSOR, and the Shaffer declaration—has the CDCR ever argued that accelerating initial youth offender parole hearings more than Rule 3043(f) allows might somehow result in inmate releases sooner than public safety considerations might warrant. That is not surprising, since any parole

release will ultimately depend on a suitability determination, not the timing of the initial parole hearing. Perhaps, over time, in light of experience, and with improved efficiency in addressing the technical hurdles it has put forth, the CDCR might be persuaded to expand the categories of hearing-advancing credits available to youth offenders in the section 3051 parole scheme. But under the highly deferential rational basis standard we must apply in equal protection analysis, we cannot second-guess the policy choices reflected in Rule 3043(f).

## III.

We are left with one remaining argument, a claim the *Nguyen* panel had no occasion to address since it was not raised in that case. Because, in determining the YPED, the CDCR does not utilize all credits used to determine MEPDs, Thai contends he is being deprived of due process protection. He offers no authority for this conclusory argument. Nor does he attempt to explain how expanding the categories of credits to be applied in setting his YPED would improve the accuracy of the CDCR's parole decisionmaking or guard against arbitrary parole denial. He simply claims that, as a youth offender, he and other youthful offenders would derive unique benefit from even earlier consideration for parole than they are currently being afforded. According to Thai, he "receives no meaningful parole-advancing benefit for his excellent behavior and sustained participation in rehabilitat[ive] programs." That argument is overstated, and in any event, as noted above, presents a policy issue not a constitutional issue.

## DISPOSITION

The petition for habeas corpus relief is denied and the petition is discharged.

31

STREETER, J.

I CONCUR:

BROWN, P. J.

Goldman, J.

I concur in the opinion but note that, in defending Rule 3043(f), the Attorney General did not focus on the rulemaking documents that led to its adoption—the Initial Statement of Reasons (ISOR) and the Final Statement of Reasons (FSOR)—and instead submitted a declaration by an agency official setting forth a similar explanation but with different points of emphasis and detail. The Attorney General did include the FSOR among the return's exhibits, but the ISOR was omitted even though it contains the more comprehensive statement of CDCR's rationale. Of course, we may take judicial notice of it on our own motion as "part of the official statement of regulatory intent" (*Working Families of Monterey County v. King City Planning Com.* (2024) 106 Cal.App.5th 833, 849, fn. 8), but the Attorney General's decision to rely instead on the Shaffer declaration explains why the opinion does not start with what would normally be one of the most obvious sources for discerning a regulation's rationale.[16] In a challenge to a regulation, these rulemaking documents serve as approximate equivalents to the "legislative findings" and "reports of legislative committees" that, in the

---

[16] I do not mean to suggest that it was improper for the Attorney General to offer a declaration. (See, e.g., *Amezcua v. City of Pomona* (1985) 170 Cal.App.3d 305, 310 [declaration by Director of Public Works articulated a rational basis for city ordinance]; *Tamura v. F.A.A.* (D. Hawaii 1987) 675 F.Supp. 1221, 1230 [affidavit of FAA official furnished rational basis for agency regulations].) But after-the-fact declarations may be more common in rational basis review when contemporaneous explanations are unavailable. (Cf. *Hancock Industries v. Schaeffer* (3d Cir. 1987) 811 F.2d 225, 237 ["The court accepts at face value contemporaneous declarations of the legislative purposes, or, *in the absence thereof*, rationales constructed after the fact, unless 'an examination of the circumstances forces [the court] to conclude that they "could not have been a goal of the legislation" ' "], italics added, fn. omitted; accord, *Barket, Levy & Fine, Inc. v. St. Louis Thermal Energy Corp.* (8th Cir. 1994) 21 F.3d 237, 240.)

1

statutory context, "aid[] informed judicial review . . . by revealing the rationale of the legislation."  (*U.S. v. Carolene Products Co.* (1938) 304 U.S. 144, 152; see *People v. Hardin* (2024) 15 Cal.5th 834, 852, fn. 3 ["our analysis focuses on the apparent motivations underlying the challenged classification, as revealed in the statutory text and history"].)  Nothing in the opinion should be read to imply that consideration of these contemporaneous agency records should not play a meaningful role in rational basis review of a regulation.

In the ISOR, CDCR acknowledged, as Thai himself argues, that applying credits to advance a YPED further incentivizes youthful offenders to engage in the rehabilitative conduct necessary to earn them, with attendant benefits for public safety.  (CDCR, ISOR NCR 22-05, Mar. 18, 2022, at p. 2 [the availability of credits to advance a YPED "protect[s] and enhanc[es] public safety" by "incentivizing inmates' participation in educational programming [and] encouraging rehabilitation"].)  CDCR explained that its decision to disallow the use of other credits for this purpose was necessitated simply by its own operational constraints.  (*Id.* at p. 3 [CDCR "needed to balance the goal of incentivizing youth offenders with the operational need to eliminate fluctuation of the YPED that could occur due to credits earned or lost"].)  As the court's opinion points out, our role is not to judge the wisdom of the decision, but only to decide whether it has a rational basis.  I agree that the administrative burdens CDCR identified in the ISOR meet this minimal standard, even while the Shaffer declaration suggests that technological developments could help CDCR alleviate those burdens in the future.

Trial Court:         Superior Court of California, County of Marin

Trial Judge:         Geoffrey M. Howard

Counsel:             Heather J. MacKay, under appointment by the Court of
                     Appeal, for Petitioner Hieu Ho Trong Thai.

                     Rob Bonta, Attorney General, Lance E. Winters, Sara J.
                     Romano, Assistant Attorney General, Maria G. Chan
                     and Krista L. Pollard, Deputy Attorneys General, for
                     Respondent the People.

*In re Thai* – A170701